PILLSBURY WINTHROP SHAW PITTMAN LLP
JOAN M. COTKIN (SBN 70665)
joan.cotkin@pillsburylaw.com
CHRISTOPHER W. SMITH (SBN 256494)
christopher.smith@pillsburylaw.com
725 South Figueroa Street, 28th Floor
Los Angeles, CA 90017-5406
Telephone:     213.488.7100
Facsimile:     213.629.1033

Attorneys for Defendant Footprints Behavioral Interventions, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EVANSTON INSURANCE COMPANY, an Illinois Corporation<br><br>Plaintiff,<br><br>vs.<br><br>FOOTPRINTS BEHAVIORAL INTERVENTIONS, INC., a California Corporation<br><br>Defendant. | Case No. 8:20-cv-00682-JVS-KES<br><br>Assigned to the Hon. James V. Selna<br><br>**DECLARATION OF CHRISTOPHER W. SMITH IN SUPPORT OF DEFENDANT FOOTPRINTS BEHAVIORAL INTERVENTIONS, INC.'S MOTION TO DISMISS, OR ALTERNATIVELY, STAY PROCEEDINGS**<br><br>[*Filed concurrently with Notice of Motion and Motion to Dismiss, or Alternatively, Stay Proceedings; Memorandum of Points and Authorities; Declarations of Kristine Carillo and Khoa Maxwell Nuyen; and [Proposed] Order*]<br><br>Date:      June 8, 2020<br>Time:     1:30 p.m.<br>Dept.:    10C<br><br>Complaint filed: April 8, 2020<br>Trial date: None set |

-1-

## DECLARATION OF CHRISTOPHER W. SMITH

I, Christopher W. Smith, declare as follows:

1.     I am an attorney duly licensed to practice before all courts in the State of California, and in the United States District Court for the Central District of California, with the law firm of Pillsbury Winthrop Shaw Pittman LLP, counsel for Defendant Footprints Behavioral Interventions, Inc. ("Footprints").

2.     I make this Declaration in support of Footprints' Motion to Dismiss, or Alternatively, Stay Proceedings.

3.     I make this Declaration based upon my own personal knowledge and if called upon to testify regarding the matters stated herein, I could and would competently do so.

4.     Pursuant to Local Rule 7-3, on April 22, 2020, I spoke to Michael F. Perlis, counsel for Plaintiff Evanston Insurance Company ("Evanston"), and informed him that Footprints intended to move the Court to stay the Instant Coverage Action, the basis for the Motion, and we discussed the merits of each party's position on the Motion.

5.     Attached hereto as ***Exhibit A*** is a true and correct copy of the Complaint and supporting exhibits that Evanston filed with this Court on April 8, 2020.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 4th day of May 2020, at Los Angeles, California.


                                      */s/ Christopher W. Smith*
                                       Christopher W. Smith

-2-

# *Exhibit A*

LOCKE LORD LLP
Michael F. Perlis (SBN 095992)
mperlis@lockelord.com
Richard R. Johnson (SBN 198117)
rrjohnson@lockelord.com
300 S. Grand Avenue, Suite 2600
Los Angeles, CA 90071
Telephone:   (213) 485-1500
Facsimile:    (213) 485-1200

Attorneys for Plaintiff
Evanston Insurance Company

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| EVANSTON INSURANCE COMPANY, an Illinois Corporation<br><br>Plaintiff,<br><br>vs.<br><br>FOOTPRINTS BEHAVIORAL INTERVENTIONS, INC., a California Corporation<br><br>Defendant. | CASE NO. 8:20-cv-682<br><br>HON.<br><br>**COMPLAINT FOR:**<br><br>**1) BREACH OF CONTRACT**<br>**2) DECLARATORY RELIEF**<br><br>Action Filed: April 8, 2020 |

Plaintiff alleges as follows:

## THE PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff, Evanston Insurance Company ("Evanston"), is an Illinois Corporation with its principal place of business and center of operations in Rosemont, Illinois.

2.     Defendant, Footprints Behavioral Interventions, Inc. ("Footprints"), is a

1

corporation organized and existing under the laws of the State of California, with its principal place of business and center of operations in Fountain Valley, California. Footprints provides in-home educational services for children with autism.

3.     The jurisdiction of this court over the subject matter of this action is predicated on 28 U.S.C. Section 1332(a) (diversity jurisdiction).  The amount in controversy exceeds $75,000.00, exclusive of interest and costs.  Venue is proper in this district pursuant to 28 U.S.C. Section 1391(a), because the principal place of business and center of operations of Defendant Footprints is located within this District.

### SUMMARY OF THIS DISPUTE

4.     Evanston and Footprints are parties to a contract of insurance, Specified Medical Professions Insurance Policy # SM931910 (the "Policy"), a true and correct copy of which (including the Endorsements thereto and the Application therefor) is attached hereto as Exhibit "A."

5.     In this action, Evanston:

(A)   Seeks a judicial declaration to the effect that the Policy does not provide any coverage to Footprints for a civil action filed against Footprints and an alleged Footprints employee, Abigail Kim ("Ms. Kim"), on November 14, 2019 in the Circuit Court of the State of Oregon for the County of Multnomah, in an action captioned, *J.B., as Guardian ad Litem for K.B., a minor child, v. Footprints Behavioral Interventions, Inc. and Abigail Kim*, Case No. 19-CV-49220 (the "Claim") (a true and correct copy of the Complaint filed in which is attached hereto as Exhibit "B"); and,

(2)   Asserts a breach-of-contract claim against Footprints based upon the latter's material breach of the Policy with respect to the Claim by submitting a materially false Application for the Policy that failed to disclose Footprints' knowledge of the circumstances alleged in the Claim.

# FACTUAL BACKGROUND

**A.    The Claim:**

6.      By letter dated December 11, 2019, Footprints tendered the Claim to Evanston for coverage under the Policy.  On December 20, 2019, Evanston sent Footprints a letter acknowledging receipt of the tender, and fully reserving all of Evanston's rights under the policy, at law, and in equity, including the right to disclaim coverage in whole or part, as it investigated the Claim.

7.      The Complaint alleged, in pertinent part, that: (A) Ms. Kim was a practicing therapist and employee of Footprints acting within the scope of her employment; (B)  from April 21, 2017 to November 3, 2017, Ms. Kim treated plaintiff K.B., a 13-year old male child diagnosed with autism spectrum disorder and attention deficit hyperactivity disorder, at his school and home; (C) on approximately twenty different occasions during the time that Ms. Kim was providing therapy to K.B., Ms. Kim engaged in sexual conduct with K.B., deliberately and without lawful consent or justification, and in violation Oregon criminal law; (D) Footprints was negligent in one of more of the following particulars: (1) in assigning Ms. Kim as K.B.'s therapist when she had inadequate training and experience; and (2) in failing to adequately supervise and monitor Ms. Kim's provision of therapy to K.B.; and, (E) Ms. Kim's sexual abuse of K.B. (for which Ms. Kim was ultimately convicted and sentenced to prison as discussed below) constituted illegal discrimination on the basis of sex and abuse against a protected class of victim.

8.      Based upon the above allegations, K.B.'s guardian ad litem asserted causes of action for Battery, Negligence, Public Accommodations Discrimination, and Vulnerable Person Abuse (Respondeat Superior), and prayed for judgment against defendants for $800,000 in noneconomic damages, and for his costs and disbursements necessarily incurred in the Claim.

82688022v.1                    COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF

9.     After Footprints tendered the Claim to Evanston for coverage under the Policy, Evanston learned, as part of its investigation (from publicly available news reports, official records, and other documents provided by Footprints), that:

(A)     On November 20, 2017 (twenty months before the Policy incepted), Ms. Kim (who had just learned that K.B.'s parents had requested that Footprints assign another educational aide to K.B. instead of Ms. Kim because Ms. Kim was "not a good fit") sent a lengthy email to her Footprints supervisors in which she (i) claimed K.B. had purportedly been sexually harassing her for the previous two months, and (ii) then went on to describe in lurid detail a series of sexual encounters that formed the basis of the criminal charges for which Ms. Kim was ultimately convicted;

(B)     That same day (November 20, 2017), Footprints: (i) filled out and submitted as required by applicable law a special incident report ("SIR") regarding suspected sexual abuse of K.B. and a suspected crime by Ms. Kim that could lead to criminal charges and legal action, (ii) visited the police department with K.B.'s parents and filed a police report against Ms. Kim, (iii) terminated Ms. Kim's employment with Footprints, and (iv) reported Ms. Kim to the relevant professional licensing authorities;

(C)     Ms. Kim was subsequently indicted, charged, tried, convicted of first-degree rape, second-degree sodomy, and six counts of first-degree sexual abuse in March of 2019, and sentenced to a term of more than eight years in prison in April of 2019;

(D)     Ms. Kim's trial, conviction, and sentencing were all widely covered and reported by local, national, and international newspapers and other news media available on the internet, including in an April 23, 2019 article in The Oregonian, which reported that K.B.'s parents were planning to sue

4

Footprints ("Female therapy worker, 29, sentenced to 8 years for raping autistic boy, 13, in his Gresham bedroom" [https://www.oregonlive.com/news/2019/04/female-therapy-worker-29-sentenced-to-8-years-for-raping-autistic-boy-13-in-his-gresham-bedroom.html] ["According to the boy's parents, Footprints Behavioral Interventions received more than $10,000 a month to treat the boy and a sibling from a taxpayer-funded insurance company. The family hasn't filed a lawsuit against the company that employed Kim, but a civil attorney for the family said one is likely coming."]).

## B.    Footprints' Materially False Application for the Policy

10.    On June 4, 2019 (twenty months after it terminated Ms. Kim and reported her to authorities, three months after Ms. Kim was convicted, and two months after Ms. Kim was sentenced to prison as widely reported), Footprints submitted its Application for the Policy, which was completed by Footprints Director of Human Resources and Administration, Kristine Carrillo.

11.    In the Application, Footprints answered "No" to the following questions (among others): (A) "Have you or any of your employees . . . [e]ver been convicted for an act committed in violation of any law or ordinance other than traffic offenses[?]"; (B) "Have you or any of your employees . . . [e]ver had any state professional license or license to prescribe or dispense narcotics refused, suspended, revoked, renewal refuses or accepted only on special terms or ever voluntarily surrendered same?"; and, (C) "Are you aware of any circumstances which may result in a malpractice claim or suit being made or brought against you or any of your employees?"

12.    These responses were false in that: (A) Footprints' former employee, Ms. Kim had already been convicted of first-degree rape, second-degree sodomy, and six counts of first-degree sexual abuse in March of 2019, about three months before the Application was submitted; (B) Footprints itself had reported Ms. Kim, not only to the

police, but also to the relevant professional licensing authorities on November 20, 2017 (the same day it terminated her); and, (C) Footprints was aware of Ms. Kim's abuse of K.B., which was a circumstance that it understood could result in a malpractice claim or suit.

## C. The Policy and Its Relevant Terms and Conditions

13. In reliance on the Application, Evanston issued the Policy to Footprints on a Claims-Made basis for the period of July 25, 2019 to July 25, 2020. The Policy provides a $1,000,000 each claim limit of liability and a $3,000,000 aggregate limit of liability, subject to a $1,000 each claim deductible, and is subject to various Endorsements, of which only the Sexual Acts Liability Endorsement, MESM 2057 08 15, appears to impact the coverage issues upon which Evanston's coverage disclaimer is based. Evanston's coverage position is based upon, among other things, the following provisions of the Policy:

### 1. The Insuring Agreement

14. The relevant Professional Liability Insuring Agreement,[1] which sets forth the basic scope of coverage (if any) available under the Policy, subject to its other terms and conditions and applicable law, provides as follows:

**A. Professional Liability and Claims Made Clause:** The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the

---

[1] While the Policy also contains a Special Medical Professions General Liability Coverage Part with Insuring Agreements which (subject to the Policy's other terms and conditions and applicable law) cover Damages as a result of Claims made during the Policy Period for Bodily Injury or Property Damage caused by an Occurrence, or Damages as a result of Claims made during the Policy Period for Personal and Advertising Injury caused by an offense, no coverage is potentially available for the Claim under those Insuring Agreements, because it does not involve any Bodily Injury, Property Damage, Personal and Advertising Injury, Occurrences, or offenses as defined by the Policy. Accordingly, Evanston does not address the Special Medical Professions General Liability Coverage Part given the absence of any potential coverage for the Claim thereunder.

Company pursuant to Section CLAIMS A., Claim Reporting Provision, for Professional Personal Injury:

**1.** By reason of any act, error or omission in Professional Services arising out of the conduct of the Insured's Professional Services rendered or that should have been rendered by an Insured; or

**2.** By reason of any act, error or omission in Professional Services arising out of the conduct of the Insured's Professional Services rendered or that should have been rendered by a natural person, who is not and shall not be an Insured hereunder, and through whose acts the Insured controls the provider-patient relationship as of the time of such act, error or omission;

provided:

**a.** The act, error or omission happens during the Policy Period or on or after the Retroactive Date stated in the Declarations and before the end of the Policy Period; and

**b.** Prior to the effective date of this policy the Insured had no knowledge of such act, error or omission or any fact, circumstance, situation or incident which may lead a reasonable person in the Insured's position to determine that a Claim was likely.[2]

## 2.   **Policy Exclusions**

15. The Policy provides that coverage does not apply to:

**A.** Any act, error or omission in Professional Services rendered or that should have been rendered or Professional Personal Injury committed in violation of any law or ordinance;

**B.** Any Claim based upon or arising out of any dishonest, fraudulent, criminal, malicious, knowingly wrongful, deliberate, or intentional acts, errors or omissions committed by or at the direction of the Insured;

. . . .

---

[2] Capitalized words and phrases are defined terms the definition of which is contained in the Policy, a true and correct copy of which is attached hereto as Exhibit "A."

82688022v.1    COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF

**F.** Any Claim based upon or arising out of any unlawful discrimination by any Insured;

. . . .

**M.** Injury arising out of the performance of a criminal act or caused by an Insured while under the influence of intoxicants or narcotics;

. . . .

**X.** Any Claim brought under any other Coverage Part of this policy.

### 3. The Representations Clause

16. The provision of the Policy entitled "Other Conditions C. Representations" provides that:

By acceptance of this policy, the Insureds agree as follows:

**1.** That the information and statements contained in the application(s) are the basis of this policy and are to be considered as incorporated into and constituting a part of this policy; and

**2.** That the information and statements contained in the application(s) are their representations, that they shall be deemed material to the acceptance of the risk or hazard assumed by the Company under this policy, and that this policy is issued in reliance upon the truth of such representations.

17. Pursuant to the above provision, the Application submitted on June 4, 2019, and the other documents submitted in connection with the underwriting of the Policy, form the basis of the Policy and are to be considered as incorporated into and constituting a part of the Policy.

### 4. The Sexual Acts Liability Endorsement

18. The Policy also contains a Sexual Acts Liability Endorsement, which provides (in pertinent part):

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

**I.** Specified Medical Professions Professional Liability Insurance Coverage Part is amended as follows:

Section INSURING AGREEMENT is amended by the addition of the following:

1. **Sexual Acts Liability:** The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to Section CLAIMS A., Claim Reporting Provision, for Sexual Injury arising out of any Sexual Act perpetrated or alleged to have been perpetrated by the Insured natural person or by any person for whose actions the Insured is legally responsible, or for allegations that the Insured was negligent in hiring, training or supervising any Insured natural person who perpetrated or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury provided:

   1. Such Sexual Act is perpetrated or alleged to have been perpetrated during the Policy Period or on or after the Retroactive Date stated in the Declarations and before the end of the Policy Period; and

   2. Prior to the effective date of this policy the Insured had no knowledge of such Sexual Act or any fact, circumstance, situation or incident involving such Sexual Act which may lead a reasonable person in the Insured's position to conclude that a Claim was likely.

2. Section DEFINITIONS is amended by the addition of the following:

   **Sexual Act** means sexual abuse, sexual molestation or sexual exploitation arising out of the conduct of the Insured's Professional Services.

9

Case 8:20-cv-00682-JVS-KES   Document 1   Filed 04/08/20   Page 10 of 29   Page ID #:10

**Sexual Injury** means bodily injury, sickness, disease, unlawful detention, false imprisonment, humiliation, emotional distress, mental anguish, sexual dysfunction, invasion of right of privacy, assault or battery, solely when arising out of a Sexual Act.

3. Section THE EXCLUSIONS L. is deleted.

4. Section THE EXCLUSIONS is amended by the addition of the following exclusions:

(i) Any Insured who perpetrates or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury; provided, however, the Company shall defend such Insured and pay Claim Expenses on their behalf unless it is established in fact that such Insured perpetrated such Sexual Act;

(ii) Any manager, supervisor, partner, officer, director or trustee who gains knowledge of any actual or alleged Sexual Act and fails to take reasonable care to prevent a future Sexual Act;

(iii) Any Claim based upon or arising out of any Sexual Act which is perpetrated or alleged to have been perpetrated by an Insured who previously perpetrated or is alleged to have previously perpetrated a Sexual Act, and after a manager, supervisor, partner, officer, director or trustee has gained knowledge of the previously perpetrated or previously alleged to have been perpetrated Sexual Act; or

(iv) Any Claim based upon or arising out of Sexual Injury to any Employee of the Insured.

5. Section LIMITS OF LIABILITY is amended by the addition of the following:

F. **Limit of Liability - Sexual Acts Liability Coverage:** The total liability of the Company for the combined total of Damages and Claim Expenses for all Claims under Sexual Liability Coverage insured herein is limited to:

10

1.    $1,000,000 All Claims Made by Each Claimant

2.    $3,000,000 All Claims under Sexual Acts Liability Coverage

**G.    Multiple Sexual Acts:** Two or more Sexual Acts against one person shall be deemed to be one Sexual Act and shall be subject to the coverage and limits in effect at the time of the first Sexual Act.

6.    Section LIMITS OF LIABILITY B. is amended by the addition of the following: Subject to Section LIMITS OF LIABILITY F., Limits of Liability - Sexual Acts Liability Coverage, the total liability of the Company under this endorsement for all Damages and Claim Expenses for all Claims insured herein because of Sexual Injury or allegations that the Insured was negligent in hiring, training or supervising any Insured natural person who perpetrated or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury shall be part of and not in addition to the Specified Medical Professions Professional Liability Insurance Coverage Part Aggregate Limit of Liability stated in the Declarations, arising out of all Claims first made against the Insured during the Policy Period and the Extend Reporting Period, if exercised.

**II.    Specified Medical Professions General Liability Insurance Coverage Part is amended as follows:**

1.    Section DEFINITIONS is amended by the addition of the following:

**Sexual Act** means sexual abuse, sexual molestation or sexual exploitation arising out of the conduct of the Insured's Professional Services.

**Sexual Injury** means bodily injury, sickness, disease, unlawful detention, false imprisonment, humiliation, emotional distress, mental anguish, sexual dysfunction, invasion of right of privacy, assault or battery, solely when arising out of a Sexual Act.

---

11

**2.** Section THE EXCLUSIONS A. is amended by the addition of the following exclusions:

**(i)** Based upon or arising out of any Sexual Injury; or

**(ii)** Based upon or arising out of any allegations that the Insured was negligent in hiring, training or supervising any person who perpetrated or is alleged to have perpetrated a Sexual Act resulting in Sexual Injury.

**D.     Evanston's Disclaimer of Coverage for the Claim under the Policy.**

19.     By letter dated March 24, 2020, Evanston disclaimed coverage for the Claim in its entirety pursuant to Proviso b. of the Policy's Insuring Agreement [and which also appears as Proviso 2. in the Sexual Liability Endorsement] ("Prior to the effective date of this policy the Insured had no knowledge of such Sexual Act or any fact, circumstance, situation or incident involving such Sexual Act which may lead a reasonable person in the Insured's position to conclude that a Claim was likely").

20.     Evanston disclaimed coverage under the Policy for the Claim only after:

- Notifying the Insured in a letter dated February 20, 2020 that it was Evanston's intention to disclaim coverage on that basis because it appeared, from the allegations in the complaint and the publicly available news reports  (and Evanston had seen no evidence to the contrary), that Footprints has been aware, since November 2017 (over a year prior to the inception of the Policy Period on July 25, 2019), of the Sexual Acts that Ms. Kim perpetrated against K.B;

- Requesting copies of any and all Footprints communications, reports, and other documents referencing any sexual contact between Ms. Kim and the minor claimant, including the records of Ms. Kim's report to her supervisor in November 2017, and any documentation of any investigation by law enforcement

concerning Ms. Kim's involvement with the minor claimant so Evanston could fully evaluate the Claim and Footprints' pre-Policy Period knowledge of the Sexual Acts alleged therein;

- Giving Footprints thirty (30) days to provide Evanston with the requested materials and any other information/documentation demonstrating, to the contrary, that Footprints was not aware of the Sexual Acts prior to the inception of the Policy, while noting that, absent the receipt of such information, it would disclaim coverage for the Claim under the Policy; and,

- Receiving a March 5, 2020 letter from Footprints' coverage counsel which, while raising various inapposite legal arguments and failing to provide the requested information, confirmed that Footprints had in fact been aware of the Sexual Acts in question since November 2017 (over a year prior to the inception of the Policy Period). [3]

**E.      Footprints Finally Provides Additional Documentation Demonstrating Its Pre-Policy Period Knowledge of the Sexual Acts Underlying the Claim.**

---

[3] Evanston also noted, since it appeared that no coverage may be available, that Evanston would <u>only</u> consider the reimbursement of reasonable Claims Expenses <u>after</u> it had determined whether or not to disclaim coverage, and that it would not reimburse any Claims Expenses if it disclaimed coverage for the Claim under the Policy.  In light of the fact that Evanston appointed defense counsel pending its determination as to coverage, Evanston agreed to reimburse reasonable post-tender defense fees and costs incurred with current appointed counsel up to the date of this letter, and, should Footprints wish to appoint different counsel, to continue to reimburse appointed defense counsel for an additional thirty days following the date of the coverage disclaimer, to permit Footprints to proceed with counsel of its choosing.  Footprints is also free, after Evanston's disclaimer, to continue using appointed defense counsel, at the Insured's own expense, should it wish to do so.  Nothing to be decided in this action should in any way be able to impact Footprints' defense of the Claim, as Evanston's coverage disclaimer is based upon official documents and other publicly available facts that will not be in dispute in the trial of the underlying Claim.

COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF

21.    In response to Evanston's March 24, 2020 coverage disclaimer letter, Footprints' counsel finally provided Evanston that same day with some of the requested documentation, including (among other things): (1) the November 20, 2017 Special Incident Report (the "SIR") (which was prepared by Footprints as required by applicable law and which, among other things, documented and described in detail: [a] the Sexual Acts perpetrated by Ms. Kim against KB, [b] the reporting of the matter to the police, and [c] Footprints' belief that KB "was the victim of a crime" that "may result in criminal charges or legal action"); and, (2) various Footprints internal email strings including the email from Ms. Kim to others at Footprints in which she alleges that KB was harassing her (and describes in lurid detail the series of sexual encounters with the 13-year old K.B. for which she was ultimately convicted).  Due to the sensitive nature of the matters discussed and to protect the privacy interests of third parties, Evanston does not attach those documents to this Complaint but will submit them to the Court in appropriate form (either redacted or under seal) at the appropriate time.

22.    Those two documents in particular, Ms. Kim's November 20, 2017 email to her Footprints supervisors, Corey Stump and Victoria Coe, and the November 20, 2017 SIR prepared by Footprints itself, establish beyond any doubt or dispute, that Footprints was aware of the Sexual Acts committed by Ms. Kim against KB, at the very latest, on that date, over twenty months prior to the inception of the Policy Period on July 25, 2019.  Accordingly, there is simply no dispute that coverage for the Claim is precluded by Proviso 2. of the Policy's Insuring Agreement.

23.    In Ms. Kim's November 20, 2017 email to her supervisors, she claims that KB, an autistic minor child who had just turned 13 years old, "has been sexually harassing [her] since October," and then goes on to describe, in excruciating detail, a disturbing series of sexual encounters between KB and Ms. Kim which, regardless of who purportedly initiated them, should have been reported to Footprints and KB's parents immediately, but instead continued to occur over the course of two months,

Case 8:20-cv-00682-JVS-KES   Document 12-4   Filed 05/04/20   Page 18 of 82   Page ID
#:187
Case 8:20-cv-00682-JVS-KES   Document 1   Filed 04/08/20   Page 15 of 29   Page ID #:15

ultimately escalating into extreme intimate sexual contact between a minor child and an adult caregiver that is manifestly felonious on its face as Ms. Kim describes it (particularly given Ms. Kim's repeated acquiescence in and failure to stop or report such sexual contact, at a time when she was reportedly asking her Footprints supervisors to let her spend more time alone with the child [in his bedroom]).

24.     Footprints obviously did not believe Ms. Kim's side of the story, as it immediately terminated her, reported her to licensing authorities and the police, and filed that same day the SIR as required to be filed by applicable federal law. (Incidentally, while it is not key to Evanston's coverage disclaimer pursuant to Proviso 2., the SIR, a legally mandated report as to which Footprints knew accuracy was required, reveals that Footprints determined, while Ms. Kim was still an employee, that her Sexual Acts against KB were likely to result in criminal charges and legal action.) In the SIR (which states that it is "REQUIRED BY TITLE 17, §54327"), which Footprints prepared the same day it received Ms. Kim's email, the Insured (among other things):

    (1)     Identifies the minor child, KB, as the "Consumer";

    (2)     Reports that the "Consumer [KB] was the victim of a crime";

    (3)     Reports "Reasonably suspected abuse/exploitation[,] Physical[,] Psychological[, and] Sexual";

    (4)     Reports an "occurrence/allegation of consumer abuse[, specifically an] Event which may result in criminal charges or legal action[, …] may result in denial of consumer's right(s)[, a] which appears to have a significant negative affect on consumer's health, safety, or well-being;

    (5)     Reports "Alleged violation of consumer's right(s)";

    (6)     Documents an "Event which may result in criminal changes/legal action[, namely a] Health and safety issue[, specifically] Sexual harassment [and] Inappropriate contact involving [an] Aggressive act to staff";

---

15

COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF

(7) Describes the reported incident as follows: "Abigail Kim, MA, RBT, age 28, reported to Corey Stump, MA, BCBA, and Victoria Coe, MA, BCBA, allegations of sexual harassment and assault against her by a minor in the care of Footprints Behavioral Interventions, age 13[; p]lease see additional information on page 3 of this document[; following the report, Corey Stump, MA, BCBA, and Victoria Coe, MA, BCBA, informed Abigail Kim, MA, RBT, that they would be reporting what she shared to the authorities and the client's family";

(8) Copies into the report, starting at page 3 as referenced in the incident description, the full text of Ms. Kim's November 20, 2017 email describing the series of sexual encounters between her and KB;

(9) Describes the immediate action taken by Footprints as follows: "Footprints Behavioral Interventions terminated Abigail Kim's, MA, RBT, employment and reported her to the necessary licensing organizations as well as the Gresham Police Department for not following company procedure."

(10) Describes its plan to prevent future occurrences as follows: "Abigail Kim, MA, RBT, has been terminated from employment with Footprints Behavioral Interventions. Additionally, the BACB will be notified on 11/21/17 along with the Oregon Behavior Analysis Regulatory Board of the above report. There will be an ongoing police investigation."

25. The November 20, 2017 KB SIR and the November 20, 2017 email from Ms. Kim to Footprints leave no doubt whatsoever that Footprints was aware of the Sexual Acts alleged in the Claim at the latest on that date, over twenty months prior to the inception of the Policy Period on July 25, 2019. Therefore, there is no doubt whatsoever that coverage for the Claim is precluded by Proviso 2. of the Policy's Insuring Agreement.

26. While Footprints has objected to Evanston's declination of coverage pursuant to Proviso 2., it admits the sole material fact upon which the declination is

COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF

82688022v.1

based, namely that Footprints was aware of Ms. Kim's Sexual Acts against K.B. since November 20, 2017, over twenty months prior to the inception of the Policy Period.

27. Moreover, while Footprints has also contended that its Application was purportedly not false because Ms. Kim was no longer an employee at the time she was convicted, the language of the Application is clearly not so limited, and Ms. Kim certainly was an employee, both when she committed the Sexual Abuse against K.B., and on November 20, 2019, the day on which Ms. Kim (i) notified her Footprints supervisors of her two-month-long series of Sexual Acts with K.B. (which she mischaracterized as sexual harassment by the 13-year old disabled minor child in her care); (ii) was reported to professional licensing authorities and to the police (in a police report that ultimately led to Ms. Kim's trial and conviction); and, was terminated from employment.

28. Also irrelevant to Evanston's declination of coverage are Footprints' baseless assertions that it had no reason to anticipate that KB's family was likely to file suit against it (even if the statement were true, which it clearly is not). Footprints' contention in this regard is: (A) simply irrelevant because the invocation of Proviso 2. does not require any anticipation of litigation; and, (B) also clearly false, as demonstrated, not only by the SIR (in which Footprints reports that KB "was the victim of a crime" in an "occurrence/allegation of consumer abuse … which may result in criminal charges or legal action"), but also by public news reports of Ms. Kim's widely covered trial and sentencing to prison, like the one from a few months before the date of the Application which is quoted above in Paragraph 9(C), and which reports that K.B.'s parents had retained a civil litigation attorney and were planning to file suit against Footprints.

29. Since Footprints still purports to dispute the correctness of Evanston's disclaimer, however, Evanston files this action against Footprints seeking: (A) a judicial

COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF

declaration confirming that no coverage is available under the Policy for the Claim; and, (B) damages and/or other appropriate relief for Footprints' breach of the Policy.

## **COUNT ONE: DECLARATORY RELIEF**

30.     Evanston hereby incorporates by reference Paragraphs 1 through 29, above, as if fully set forth herein.

31.     By virtue of the foregoing matters, an actual and justifiable controversy has arisen and now exists between the parties, within the jurisdiction of the Court, regarding whether coverage is available to Footprints under the Policy for the Claim.

32.     Declaratory relief is both appropriate and necessary in light of the conflicting positions of the parties with respect to the Policy and the Claim.  Evanston desires a judicial determination of the parties' respective rights and obligations in connection with the Policy and the Claim.

33.     For the reasons set forth above, Evanston respectfully requests that this Court confirm that no coverage is available to Footprints under the Policy for the Claim because  (*inter alia*):

(A)     Coverage for the Claim in its entirety is precluded by application of Proviso 2. of the Insuring Agreement as modified by the Sexual Liability Endorsement because Footprints was aware of the Sexual Acts alleged in the Claim no later than November 20, 2017, over twenty months prior to the inception of the Policy Period; and,

(B)     If coverage were otherwise potentially available under the Insuring Agreement, then other terms and conditions of the Policy would also operate to limit or preclude coverage, including, without limitation, Exclusions A, B, F, M, (i), (ii), and (iii), and the Representations Clause (which precludes coverage for matters based upon circumstances not disclosed as required in the Application).

COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF

## COUNT TWO: BREACH OF CONTRACT

34.    Evanston hereby incorporates by reference paragraphs 1 through 33 above, as if set forth fully herein.

35.    Evanston has performed all conditions, covenants, and promises required to be performed on its part except those excused, hindered or prevented by Footprints.

36.    Footprints materially breached the terms of the Policy by failing to disclose, in response to at least three specific questions in the Application as outlined above, the Sexual Acts underlying the Claim, Ms. Kim's felony conviction for the same, and the likelihood that K.B. would file a civil action against Footprints, all of which Footprints was undeniably aware of when it submitted the materially false Application for the Policy in June of 2019.

37.  The Policy expressly provides that Evanston issued it based in part upon the purported accuracy of the Application, which, as demonstrated above, was in fact materially false.

38.    Evanston has been damaged by Footprints' breach of the Policy, in a still undetermined amount according to proof, because those breaches have caused Evanston to incur expenses in investigating and responding to the Claim, and subjected Evanston to still undetermined exposure in connection with the Claim, for which Evanston intends to hold Footprints responsible.

39.    As a proximate result of Footprints' material breaches of the Policy, Evanston has suffered damages, and continues to suffer damages, in an amount to be proven at trial, but no less than $75,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Evanston Insurance Company prays for the following relief:

1.    That this honorable Court should determine and declare the parties' respective rights and obligations under the Policy and at law.

2. That this honorable Court should find and declare that the Policy provides no coverage to Footprints for the Claim, or any sums incurred in connection therewith.

3. That this honorable Court find and rule that Footprints materially breached the terms of the Policy by submitting a materially false Application for the Policy.

4. Compensatory damages in an amount no less than $75,000.00, the specific amount to be determined at trial.

5. Costs incurred in this matter.

6. Such other and further relief as the Court deems just and proper.

Dated: April 8, 2020

Respectfully submitted,

LOCKE LORD LLP

By: _____

Michael F. Perlis
Richard R. Johnson
Attorneys for Plaintiff
Evanston Insurance Company

82688022v.1   COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF

# Exhibit A

Case 8:20-cv-00682-JVS-KES Document 1 Filed 04/08/20 Page 22 of 40 Page ID #:22

**A STOCK COMPANY**



# EVANSTON INSURANCE COMPANY

Ten Parkway North
Deerfield, IL 60015

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

**Secretary**                    **President**

MJIL 1000 08 10                                    Page 1 of 1

Case 8:20-cv-00682-JVS-KES Document 12-4 Filed 05/04/20 Page 26 of 82 Page ID
Case 8:20-cv-00682-JVS-KES Document 1 Filed 04/08/20 Page 23 of 29 Page ID
#:195



## EVANSTON INSURANCE COMPANY

## CALIFORNIA SURPLUS LINES NOTICE (D-2)

**1. THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.**

**2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.**

**3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.**

**4. THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 1-800-927-4357 OR INTERNET WEB SITE WWW.INSURANCE.CA.GOV. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.**

5. FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

6. FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

7. CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.

8. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.

Case 8:20-cv-00682-JVS-KES Document 12-4 Filed 05/04/20 Page 28 of 82 Page ID
Case 8:20-cv-00682-JVS-KES Document 1 Filed 04/08/20 Page 25 of 29 Page ID
#:197



INTERLINE

# PRIVACY NOTICE

We are committed to safeguarding your privacy. We understand your concerns regarding the privacy of your nonpublic personal information. No nonpublic personal information is required to be collected when you visit our websit es; however, this information may be requested in order to provide the products and services described. We do not sell nonpublic personal information to non-affiliated third parties for marketing or other purposes. We only use and share this type of information with non-affiliated third parties for the purposes of underwriting insurance, administering your policy or claim and other purposes as permitted by law, such as disclosures to insurance regulatory authorities or in response to legal process. Notwithstanding the foregoing, we may use this information for the purpose of marketing our own products and services to you.

We collect nonpublic personal information about you from the following sources:

- Information we receive from you on applications or other forms;

- Information about your transactions with us, our affiliates, or others; and/or

- Information we receive from consumer reporting agencies and inspection reports.

We do not disclose any nonpublic personal information about our customers/claimants or former customers/claimants to anyone, except as permitted by law.

We may disclose nonpublic personal information about you to the following types of third parties:

- Service providers, such as insurance agents and/ or brokers and claims adjusters; and/or

- Other non-affiliated third parties as permitted by law.

We restrict access to nonpublic personal information about our customers/claimants to those individuals who need to know that information to provide products and services to our customers/claimants or as permitted by law. We maintain physical, electronic, and procedural safeguards to guard your nonpublic personal information.

*Residents of California:*

You may request to review and make corrections to recorded non-public personal information contained in our files. A more detailed description of your rights and practices regarding such information is available upon request. Please contact your agent/broker for instructions on how to submit a request to us.



INTERLINE

# EVANSTON  INSURANCE  COMPANY

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



## POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

RE:   Policy Number: SM931912
       Insured:  Footprints Behavioral Interventions Inc.; Footprints Behavioral Health Corp.
       Insurer:  EVANSTON INSURANCE COMPANY

You are hereby notified that under the Terrorism Risk Insurance Act as amended in 2015 the definition of terrorism has changed. As *defined in Section 102(1) of the Act*: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Under the Act, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. The Act requires Evanston Insurance Company to also notify you that Terrorism Coverage required to be offered by the Act for losses caused by certified acts of terrorism is partially reimbursed by the United States Government under a formula established by federal law. Under this formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

The Terrorism Risk Insurance Act as amended, contains a $100 billion cap that limits United States Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

Nothing in this notice affects or modifies your coverage except and only to the extent specifically required by the Act.

Certified Acts of Terrorism coverage is provided for no additional premium.



# EVANSTON INSURANCE COMPANY

## HEALTH CARE UMBRELLA LIABILITY POLICY
## DECLARATIONS

POLICY NUMBER: SM931912 PREVIOUS POLICY NUMBER: UM800932

**1. Named Insured and Mailing Address:**

FOOTPRINTS BEHAVIORAL INTERVENTIONS INC.; FOOTPRINTS BEHAVIORAL HEALTH CORP.
11037 WARNER AVE SUITE 339
FOUNTAIN VALLEY, CA 92708

**2. Policy Period:** From: 07/25/2019 To: 07/25/2020
12:01 A.M. Standard Time At Your Address Shown Above

**3. Retroactive Date:** June 13, 2018 (This policy's inception date applies unless otherwise noted here.)

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| 4. | Policy Premium: | | |
|---|---|---|---|
| | **A.** | Flat Premium: X or Adjustable Premium: (check flat or adjustable) | |
| | **B.** | Rate: Flat | |
| | **C.** | Minimum Premium: | $ REDACTED |
| | **D.** | Deposit Premium: | $ |
| | **E.** | Policy Minimum Earned Premium: 25% | |

| 5. | Limits of Insurance: | |
|---|---|---|
| | **A.** | Each Occurrence, Offense or Claim Limit: | $ 2,000,000 |
| | **B.** | Combined Aggregate Limit: | $ 2,000,000 |

**6. Underlying Insurance:** See Schedule of Underlying Insurance attached MDHX 2001 03 11.

**7. Forms and Endorsements attached to this policy at time of issuance:**
See Schedule of Forms and Endorsements attached MDIL 1001 08 10.

| Producer Number, Name and Address |
|---|
| 32453 |
| McGowan, Donnelly, & Oberheu |
| 2700 Via Fortuna Dr. Ste. 145 |
| Austin, TX 78746 |

Case 8:20-cv-00682-JVS-KES Document 12-4 Filed 05/04/20 Page 32 of 82 Page ID
Case 8:20-cv-00682-JVS-KES Document 1 Filed 04/08/20 Page 29 of 49 Page ID
#:201

8.    **NOTICES:**

Notices required to be provided to us under this policy shall be addressed to:

**CLAIM AND POTENTIAL CLAIM NOTICES:**       **ALL OTHER NOTICES:**

Claims Service Center                        Markel Mid South Region, a division of Markel
MARKEL SERVICE, INCORPORATED                 Service, Incorporated
Ten Parkway North                            7500 Dallas Parkway, Suite 400
Deerfield, Illinois 60015                    Plano, TX  75024-4018
                                             Telephone: (469) 241-3400
Fax: (855) 662-7535                          Fax: (866) 730-3615
E-mail: newclaims@markelcorp.com

**These declarations, together with the Policy, any Endorsement(s) and any application(s), complete the above numbered policy.**

| Countersigned 08/21/2019 | By: |
| (Date) | AUTHORIZED REPRESENTATIVE |



# EVANSTON INSURANCE COMPANY

## HEALTH CARE UMBRELLA LIABILITY POLICY
## SCHEDULE OF UNDERLYING INSURANCE

| Policy Number: | Effective Date: | Named Insured: |
|---|---|---|
| SM931912 | 07/25/2019 | Footprints Behavioral Interventions Inc.; Footprints Behavioral Health Corp. |

| Carrier, Policy Number, and Period | Type of Policy | Applicable Limits or Amounts of Insurance |
|---|---|---|
| Evanston Insurance Company SM931910 07/25/2019 to 07/25/2020 "controlling underlying insurance" | Commercial General Liability | Bodily Injury and Property Damage Combined $1,000,000 Each Occurrence $3,000,000 General Aggregate         [ ] per project/location $Included Products-Completed Operations Aggregate $Included Personal & Advertising Injury Limit Retroactive Date, if applicable: 07/25/2005 |
| First Insurance Company of HI CBA 6370043 10/18/2019 to 10/18/2020 "controlling underlying insurance" | Commercial Automobile Liability | Bodily Injury and Property Damage Combined $1,000,000 Combined Single Limit |
| Berkshire Hathaway FOWC910127 09/10/2019 to 09/10/2020 "controlling underlying insurance" | Employers Liability | Bodily Injury by Accident $1,000,000 Each accident Bodily Injury by Disease $1,000,000 Policy limit aggregate Bodily Injury by Disease $1,000,000 Each employee |
| Evanston Insurance Company SM931910 07/25/2019 to 07/25/2020 "controlling underlying insurance" | Professional Liability | $1,000,000 Per Claim $3,000,000 Aggregate Retroactive Date, if applicable: 07/25/2008 |
| LEFT BLANK INTENTIONALLY | | |



# EVANSTON INSURANCE COMPANY

## FORMS SCHEDULE

| FORM NUMBER | FORM NAME |
| --- | --- |
| MJIL 1000 08 10 | Policy Jacket |
| MPIL 1005-CA 01 17 | California Surplus Lines Notice (D-2) |
| MPIL 1007 03 14 | Privacy Notice |
| MPIL 1083 04 15 | US Treasury Dept's Office Of Foreign Assets Control ("OFAC") Notice |
| ZZ-50000 01 15 | Policyholder Disclosure of Terrorism Insurance Cov |
| MDHX 2000 03 11 | Health Care Umbrella Liability Policy Declarations |
| MDHX 2001 03 11 | Health Care Umbrella Liab Pol Sched of Underly Ins |
| MDIL 1001 08 10 | Forms Schedule |
| MEHX 0001 03 11 | Health Care Umbrella Liability Policy |
| MEHX 2302 05 15 | Exclusion - Unmanned Aircraft |
| MEIL 1200-CA 03 16 | Service of Suit - California |
| MEIL 5231 01 15 | Certified Acts of Terrorism Coverage |
| MIL 1214 09 17 | Trade Or Economic Sanctions |



# EVANSTON INSURANCE COMPANY

## HEALTH CARE UMBRELLA LIABILITY POLICY
### FOLLOWING FORM - OCCURRENCE OR CLAIMS MADE

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties, and what is and is not covered.

Throughout the policy the words "you" and "your" refer to the Named Insured shown in item 1. of the Declarations. The words "we," "us," and "our" refer to the Insurance Company stated in the Declarations providing this insurance.

The word "insured" means any person or organization qualifying as such under Section Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section Definitions for their explanation.

In consideration of the payment of the premium, and in reliance upon the statements and representations made in the Application, and subject to mutual agreements set forth herein and in the Declarations, and subject to all the terms and conditions of this policy, we hereby agree with you as follows:

## INSURING AGREEMENTS

**A.    Coverage A – "Bodily Injury" and "Property Damage" Liability Insuring Agreement**

    **1.**  We will pay on behalf of the insured for that portion of "ultimate net loss" in excess of the "underlying limit" because of "bodily injury" or "property damage" to which this insurance applies, but only up to the Limits of Insurance stated in the Declarations. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section Defense And Supplementary Payments Coverages A And B.

    **2.**  We will follow form over Additional Insureds covered in the "controlling underlying insurance" to the extent of their liability due to the negligence of the Named Insured.

**B.    Coverage B – "Personal and Advertising Injury" Liability Insuring Agreement**

    **1.**  We will pay on behalf of the insured that portion of "ultimate net loss" in excess of the "underlying limit" because of "personal and advertising injury" to which this insurance applies, but only up to the Limits of Insurance stated in the Declarations. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section Defense And Supplementary Payments Coverages A And B.

    **2.**  We will follow form over Additional Insureds covered in the "controlling underlying insurance" to the extent of their liability due to the negligence of the Named Insured.

**C.    Occurrence or Claims-Made Coverage Following Form Agreement**

    **1.  Occurrence Following Form:**  With respect to Coverage A and Coverage B, this insurance applies to "bodily injury," "property damage," or "personal and advertising injury" covered by the "controlling underlying insurance" written on an "occurrence" basis and listed in the Schedule of Underlying Insurance, but only if:

        **a.**  The "bodily injury" or "property damage" was caused by an "occurrence," and/or the "personal and advertising injury" was caused by an "offense";

**MEHX 0001 03 11**         Includes copyrighted material from Insurance Services Office, Inc., with its permission.         **Page 1 of 21**

**b.** The "occurrence" or "offense" took place in the "coverage territory," and

**c.** The "bodily injury," "property damage," "personal and advertising injury" occurred during the policy period of this policy.

It is agreed that:

**(1)** With respect to your liability for "bodily injury" to your "employees" arising out of and in the course of their employment by you:

  **(a)** "Bodily injury" by disease must be caused by or aggravated by the conditions of that employment; and

  **(b)** An "employee's" last day of last exposure to conditions causing or aggravating such a disease must occur during the policy period of this policy.

**(2)** "Damages" because of "bodily injury" include "damages" claimed by a person or organization for care or loss of services or death resulting at any time from the "bodily injury."

**(3)** "Property damage" that is loss of use of tangible property that is not physically injured or destroyed shall be deemed to occur at the time of the "occurrence" that caused it.

**2.** **Claims Made Following Form:** With respect to Coverage A and Coverage B, this insurance applies to "bodily injury," "property damage," or "personal and advertising injury" covered by the "controlling underlying insurance" written on a claims made basis and listed in the Schedule of Underlying Insurance; this insurance applies only if a "claim" for "damages" is first made against an insured during the policy period, including the extended reporting period, if exercised pursuant to all "underlying insurance". With respect to Coverage A and Coverage B, this insurance also applies to an "occurrence", "offense," "bodily injury," "property damage," or "personal and advertising injury" which is reported to the "underlying insurer" with the required detail as an event reasonably expected to result in a "claim," provided such event is covered by all applicable "underlying insurance" written on a claims made basis and listed in the Schedule of Underlying Insurance and provided such event is also reported to us on the same date including the required elements stated in the "underlying insurance."

But this insurance does not apply to "bodily injury," "property damage," or "personal and advertising injury" which occurred:

**a.** Before the "retroactive date" shown in item 3. of the Declarations Page of this policy ; or

**b.** After the expiration of this policy.

It is agreed that:

**(1)** With regard to an "occurrence," "offense," "bodily injury," "property damage," or "personal and advertising injury" which is reported to the "underlying insurer" and to us with the required detail, as an event reasonably expected to result in a "claim," and which, by such reporting, is subject to the coverage afforded by the "underlying insurer," then any "claim" subsequently made against the insured arising out of such event shall be deemed for the purpose of this insurance to have been made on the date on which such written notice is received by the "underlying insurer."

**(2)** All "claims" for "damages" because of "bodily injury" to the same person will be deemed to have been made at the time the first of those "claims" is made against an insured. This includes "damages" claimed by a person or organization for care, loss of services, or death resulting at any time from the "bodily injury."

**(3)** All "claims" for "damages" because of "property damage" causing loss to the same person or organization as a result of an "occurrence" will be deemed to have been made at the time the first of those "claims" is made against an insured.

Case 8:20-cv-00682-JVS-KES   Document 11   Filed 04/08/20   Page 34 of 49

(4) All "claims" for "damages" because of "personal and advertising injury" to the same person or organization as a result of an "offense" will be deemed to have been made at the time the first of those "claims" is made against any insured.

# EXCLUSIONS

**A.   Coverage A – "Bodily Injury" and "Property Damage" Liability Exclusions**

Coverage A of this policy does not apply to:

**1.**   "Bodily injury" or "property damage" that is intended by the insured or can be expected from the standpoint of a reasonable person to cause "bodily injury" or "property damage," even if the "bodily injury" or "property damage" is of a different degree or type than actually intended or expected. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**2.**   "Bodily injury" or "property damage" for which the insured is obligated to pay "damages" by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for "damages":

    **a.**   Assumed in an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

    **b.**   That the insured would have in the absence of the contract or agreement.

**3.**   "Bodily injury" to:

    **a.**   Any "executive officer," director, or "employee" of the insured who is injured by another "executive officer," director, or "employee" of the same insured in the course of such employment except to the extent that coverage is provided by a policy listed in the Schedule of Underlying Insurance and then only to the extent provided by such policy or policies; or

    **b.**   Any "executive officer," director, or "employee" of the insured, or an applicant for employment by the insured, caused by employment practices of the insured. Employment practices include, but are not limited to, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination, wrongful dismissal or wrongful termination of an "executive officer," director, or "employee"; or

    **c.**   Any "executive officer," director, or "employee" of the insured while employed in violation of the law with the actual knowledge of the insured, or the actual knowledge of any "executive officer, " director, or "employee" of the insured.

    **d.**   The spouse, child, parent, brother, or sister of that "executive officer," director, or "employee" or applicant for employment as a consequence of a., b., or c. above.

This exclusion applies:
**(1)**   Whether the insured may be liable as an employer or in another capacity; and
**(2)**   To any duty to share "damages" with or repay someone else who must pay "damages" because of such "bodily injury."

This exclusion does not apply to liability assumed by the insured in an "insured contract."

**4.**   "Bodily injury" or "property damage" arising out of the ownership, maintenance, operation, use, loading, unloading, or entrustment to others of an "aircraft" or "watercraft" owned or operated by, or chartered, rented, or loaned to any insured, except to the extent that coverage is provided by a policy listed in the Schedule of Underlying Insurance and then only to the extent provided by such policy or policies.

**5.**   "Bodily injury" or "property damage" arising out of the use of "mobile equipment" in, or while in practice or preparation for, a prearranged racing, speed, or demolition contest or in a stunting activity.

**6.**   "Property damage" to:

    **a.**   Property you own, rent or occupy;

    **b.**   Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

    **c.**   Property loaned to you;

d. Property in your care, custody, or control;

e. That particular part of real property on which you or a contractor or subcontractor working directly or indirectly for you are performing operations, if the "property damage" is due to those operations; or

f. That particular part of real property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph b. of this exclusion does not apply if the premises are "your work" and were never occupied, rented, or held for rental by you.

Paragraph c., d., e., and f. of this exclusion do not apply to liability assumed in a sidetrack agreement.

Paragraph f. of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

7. "Property damage" to "your product" arising out of it or any part of it.

8. "Property damage" to "your work" arising out of it or any part of it and included in the "products completed operations hazard."

   This exclusion does not apply if the damaged work or the work out of which the "damages" arises was performed for you by a subcontractor.

9. "Property damage" to "impaired property" or property that has not been physically injured or destroyed arising out of:

   a. A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

   b. A delay or failure by you or anyone acting for you or on your behalf to perform a contract or agreement in accordance with its terms.

   This exclusion does not apply to the loss of use of other property due to sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

10. "Damages" claimed for all loss, costs or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of "your product," "your work," or "impaired property" is such work or property is withdrawn or recalled from the market or from use by a person or organization due to a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

11. "Bodily injury" for which an insured may be held liable by reason of:

    a. Causing or contributing to the intoxication of a person;

    b. The furnishing of alcoholic beverages to a person who is under:
       (1) The legal drinking age; or
       (2) The influence of alcohol;

    c. Violation of a statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

    This exclusion only applies if any insured is in the business of manufacturing, distributing, selling, serving, or furnishing alcoholic beverages.

    This exclusion does not apply to the extent that coverage is provided by a policy listed in the Schedule of Underlying insurance. Coverage provided will follow the provisions, exclusions and limitations of the underlying insurance.

12. "Bodily injury" or "property damage" arising out of the ownership, maintenance, operation, use, loading, unloading, or entrustment to others of any "auto," except to the extent that coverage is provided by a policy listed in the Schedule of Underlying insurance and then only to the extent provided by such policy or policies.

13. Any duty to reimburse an insurer as required by the terms of any endorsement for Motor Carrier Policies of Insurance For Public Liability under Section 29 and 30 of the Motor Carrier Act of 1980, or any similar law.

Case 8:20-cv-00682-JVS-KES   Document 12-4   Filed 05/04/20   Page 39 of 82   Page ID
#:208
Case 8:20-cv-00682-JVS-KES   Document 1-1   Filed 04/08/20   Page 36 of 79
COMMERCIAL UMBRELLA

**B.** **Coverage B - "Personal and Advertising Injury" Liability Exclusions**

Coverage B of this policy does not apply to:

**1.** "Personal and advertising injury":

    **a.** Arising out of the oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

    **b.** Arising out of the oral or written publication of material whose first publication took place before the beginning of the policy period, or if written on a claims-made basis, before the "retroactive date" shown in item 3. of the Declarations page of this policy;

    **c.** Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured;

    **d.** For which the insured has assumed liability in a contract or agreement; however, this exclusion does not apply to liability for "damages" that the insured would have in the absence of the contract or agreement; or

    **e.** To an "executive officer," director, or "employee" of the insured arising from that person's employment by the insured.

**2.** "Personal and advertising injury" arising out of:

    **a.** Breach of contract, other than misappropriation of advertising ideas under an implied contract;

    **b.** The failure of goods, services to conform with advertised quality or performance;

    **c.** The wrong description of the price of goods, products or services;

    **d.** An electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control;

    **e.** An "offense" committed by an insured whose business is:

        **(1)** Advertising, broadcasting, publishing, or telecasting;

        **(2)** Designing or determining content of web-sites for others; or

        **(3)** An Internet search, access, content or service provider.

        For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**3.** "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**4.** "Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**5.** "Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**C.** **Coverages A and B – Exclusions**

Coverages A and B of this policy do not apply to:

**1.** "Ultimate net loss" arising out of or contributed to in any way by:

    **a.** The actual, alleged, or threatened discharge, dispersal, release, migration, escape, or seepage of pollutants; or

    **b.** Any loss, cost, or expense arising out of any:

        **(1)** Request, demand, or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of pollutants; or

        **(2)** Claim or suit, whether by or on behalf of any governmental authority or any other entity, for "damages" because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to, or assessing the effects of pollutants.

Case 8:20-cv-00682-JVS-KES   Document 12-4   Filed 05/04/20   Page 40 of 82   Page ID
Case 8:20-cv-00682-JVS-KES   Document 1-1   Filed 04/08/20   Page 37 of 49   **COMMERCIAL UMBRELLA**
#:209

As used in this exclusion, pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned, reclaimed, or disposed of.

**2.** "Ultimate net loss" arising out of or in connection with:

**a.** Asbestos or asbestos-related material(s), lead, or silica dust, regardless of whether used, manufactured, sold, handled, maintained, repaired, removed, disposed of, transported, distributed, installed by, or in any way connected with the insured; or

**b.** The existence of asbestos or asbestos-related material(s), lead, or silica dust in any goods, products, materials, storage devices, containers, wrappings, packaging, warehouses, buildings, or other structures of any kind, or any part thereof; or

**c.** Any goods or products which are damaged, contaminated, or otherwise affected by asbestos or any asbestos-related material(s), lead or silica dust; or

**d.** Asbestos abatement activities, including clean-up, repair, or any other corrective measures which are occasioned by the existence of asbestos or asbestos-related material(s), lead, or silica dust in any land, soil, water or watercourses, the atmosphere an/or building(s), whether voluntarily undertaken or require by any governmental body or other entity to eliminate asbestos or asbestos-related material(s), lead or silica dust; or

**e.** Any supervision, instructions, recommendations, warnings, or advice given or which should have been given, and any obligation to share "damages" with or repay someone else who must pay "damages" in connection with 2.a., 2.b., 2.c., or 2.d. above.

**3.** "Ultimate net loss" arising out of or in connection with:

**a.** "Bodily injury," "property damage" and/or "personal and advertising injury" which would not have occurred in whole or in part but for the actual, alleged or threatened contact with, exposure to, or inhalation, ingestion, absorption, discharge, dispersal seepage, migration, release, escape, presence, growth or reproduction of "mold."

**b.** Costs and expenses to investigate or defend any claim or "suit" or payment of any fine or penalty for a. above.

**c.** Any loss, cost, expense, fine or penalty arising out of any:

  **(1)** Claim, "suit," request, demand, order or statutory or regulatory requirement than any insured or others test for, monitor, clean up, remove, abate, mitigate, remediate, dispose of, contain, treat, detoxify or neutralize, or in any way respond to, or assess the concentration or effects of "mold," or

  **(2)** Claim or "suit" for "damages" because of testing for, monitoring, cleaning up, removing, abating, mitigating, remediating, disposing of, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the concentration or effects of "mold."

This exclusion 3.c.(1) and 3.c.(2) apply to any actual or alleged supervision, instructions, recommendations, warnings or advice given or which should have been given by any insured or others.

This exclusion 3.a., 3.b. and 3.c. above applies to:

  **(i)** "Bodily injury", "property damage" and "personal and advertising injury" regardless of whether such is included within the "products-completed operations hazard;"

  **(ii)** Any obligation to share "damages" with or repay someone else who must pay "damages"; and

  **(iii)** "Mold" existing, emanating from or moving anywhere indoors or outdoors.

As used in this exclusion "Mold" means any permanent or transient fungus, mold, mildew or mycotoxin, or any of the spores, scents or byproducts resulting therefrom regardless of whether they are proved to cause disease, injury or damage.

**4.** "Ultimate net loss" arising out of or in connection with any:

**a.** Refusal to employ;

**b.** Termination of employment;

**c.** Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination, any of which arise from an employment related practice;

Case 8:20-cv-00682-JVS-KES Document 12-4 Filed 05/04/20 Page 41 of 82 Page ID
Case 8:20-cv-00682-JVS-KES Document 1-1 Filed 04/08/20 Page 38 of 49
#:210

**COMMERCIAL UMBRELLA**

    **d.**    Employment-related practices, policies, acts, or omissions; or
    **e.**    Consequential "bodily injury," "property damage," or "personal and advertising injury" as a result of 4.a.,
        4.b., 4.c. or 4.d. above.

This exclusion applies whether the insured may be held liable as an employer or in any other capacity, and to
any obligation to share "damages" with or repay someone else who must pay "damages" because of such
"bodily injury," "property damage," or "personal and advertising injury."

**5.**    Liability imposed on the insured or the insured's insurer under the following laws:

    **a.**    The Employee Retirement Income Security Act (E.R.I.S.A.) of 1974 as now or hereafter amended, or
        any similar law, regulation, or order issued pursuant to it; or
    **b.**    Any uninsured motorists, underinsured motorists, or automobile no-fault or first party "bodily injury" or
        "property damage" law; or
    **c.**    Any workers' compensation, unemployment compensation, or disability benefits law, or any similar law.

**6.**    "Ultimate net loss" arising out of or that results from any consequence, direct or indirect, due to war (whether
war be declared or not), warlike action by a military force, including action in hindering or defending against
an actual or expected attack, by any government, sovereign or other authority using military personnel or
other agents, or any act or condition incident to war. War includes invasion, act of a foreign enemy, hostilities,
civil war, insurrection, rebellion, revolution, military or usurped power, strike, riot, civil commotion, revolution,
bombardment, or confiscation by order of any government or public authority.

**7.**    "Bodily injury" or "property damage":

    **a.**    With respect to which any insured under this policy is also an insured under a nuclear energy liability
        policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability
        Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an
        insured under any such policy but for its termination upon exhaustion of its limits of liability; or

    **b.**    Resulting from the "hazardous properties" of "nuclear material" and with respect to which:

        **(1)**    Any person or organization is required to maintain financial protection pursuant to the Atomic
            Energy Act of 1954, or any law amendatory thereof; or
        **(2)**    The insured is, or had this policy not been issued would be, entitled to indemnity from the United
            Sates of America, or any agency thereof, under any agreement entered into by the United States
            of America, or any agency thereof, with any person or organization.

    **c.**    Resulting from the "hazardous properties" of "nuclear material," if:

        **(1)**    The "nuclear material":
            **(a)**    Is at any "nuclear facility" owned by, or operated by or on behalf of, an insured; or
            **(b)**    Has been discharged or dispersed therefrom;
        **(2)**    The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled,
            used, processed, stored, transported or disposed of by or on behalf of an insured; or
        **(3)**    The "bodily injury" or "property damage" arises out of the furnishing by an insured of services,
            materials, parts or equipment in connection with the planning, construction, maintenance,
            operation or use of any "nuclear facility," but if such facility is located within the United States of
            America, its territories or possessions or Canada, this subparagraph (3) applies only to "property
            damage" at such "nuclear facility" and any property thereat.

As used in this exclusion:
    **a.**    "Hazardous properties" include radioactive, toxic or explosive properties;
    **b.**    "Nuclear material" means "source material," "special nuclear material," or "by-product material";
    **c.**    "Source material," "special nuclear material" and "by-product material" have the meanings given them in
        the Atomic Energy Act of 1954 or in any law amendatory thereof;
    **d.**    "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or
        exposed to radiation in a "nuclear reactor";
    **e.**    "Waste" means any waste material:

**(1)** Containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any one ore processed primarily for its "source material content"; and

**(2)** Resulting from the operation by any person or organization of any "nuclear facility" included under paragraphs (1) and (2) of the definition of "nuclear facility."

**f.** "Nuclear facility" means:

**(1)** Any "nuclear reactor";

**(2)** Any equipment or device designed or used for:

    **(a)** Separating the isotopes of uranium or plutonium;

    **(b)** Processing or utilizing "spent fuel"; or

    **(c)** Handling, processing or packaging "waste";

**(3)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235.

**(4)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

And includes the site on which any of the foregoing is located, all operations conducted on such site, and all premises used for such operations;

**g.** "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

**h.** "Property damage" includes all forms of radioactive contamination of property.

**8.** "Ultimate net loss" arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**9.** "Ultimate net loss" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**c.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

## DEFENSE AND SUPPLEMENTARY PAYMENTS COVERAGES A AND B

**A.** We will have the right to defend any "claim" or "suit" seeking "damages" for "bodily injury," "property damage," "personal and advertising injury" to which this insurance applies, but:

**1.** We have no duty to defend any insured against a "claim" or "suit" not covered by this policy.

We have no duty to defend any insured against a "claim" or "suit" not covered by the "underlying insurance."

**2.** When a "claim" or "suit" is covered by this policy and is also covered by "underlying insurance" or any other applicable insurance, we have no duty to defend. We shall have the right to associate with the insured in the defense and control of any "claim" or "suit" that we think may involve this policy.

**3.** When a "claim" or "suit" covered by this policy, would have been covered by "underlying insurance" but for the exhaustion of the applicable limit of such "underlying insurance" as a result of any "occurrence" or "offense" to which this policy would have applied, we will have a duty to defend any "claim" or "suit" to which this policy applies.

**4.** When we have a duty to defend as described in 3. above, we will:

**a.** Defend any "claim" or "suit" against the insured seeking "damages" on account of "bodily injury," "property damage," or "personal and advertising injury" even if such "claim" or "suit" is groundless, false, or fraudulent;

**b.** Investigate, negotiate, and settle any "claim" or "suit" as we deem expedient;

**c.** Pay the following Supplementary Payments:

    **(1)** Up to $250 for the cost of bail bonds required because of accidents or traffic law violations related to an accident arising out of the use of any vehicle to which this policy applies. We do not have to furnish these bonds.

    **(2)** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of any "claim" or "suit," including actual loss of earnings up to $250 a day because of time off from work.

    **(3)** "Pre-judgment interest" awarded against the insured on that part of the judgment covered under this policy. If we offer the applicable Limit of Insurance in settlement of a "claim" or "suit," we will not pay any "pre-judgment interest" imposed or earned after the date of such offer.

    **(4)** All interest earned on that part of any judgment within the Limit of Insurance after entry of the judgment and before we have paid, offered to pay, or deposited in court that part of any judgment that is within the applicable Limit of Insurance.

**B.** Payments under this section of the policy, as well as payments for all expenses we incur, will not reduce the Limit of Insurance as set forth in this policy, unless such expenses of the "underlying insurer(s)" reduce the limits of "underlying insurance" of any policy listed in the Schedule of Underlying Insurance.

**C.** Both our right and duty to defend any existing or future "claim" or "suit" end when we have exhausted the applicable Limit of Insurance by payment of judgments or settlements or expenses, if applicable, under Coverages A or B.

**D.** If we are prevented by law from carrying out A., B., and C. above, we will pay any expense incurred with our consent.

## WHO IS AN INSURED

**A.** If the Named Insured stated in item 1. of the Declarations is:

    **1.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

    **2.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

    **3.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

    **4.** An organization other than a partnership, joint venture, or "limited liability company," you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your "executive officers" and directors. Your stockholders are also insureds, but only with respect to their liability as your stockholders.

    **5.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**B.** Each of the following is also an insured:

    **1.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees," other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you and while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for "bodily injury" arising out of his or her providing or failing to provide professional health care services unless such individual is included as an insured in a policy of "underlying insurance" listed in the Schedule of Underlying Insurance.

Case 8:20-cv-00682-JVS-KES   Document 12   Filed 05/04/20   Page 44 of 82   Page ID
#:213
Case 8:20-cv-00682-JVS-KES   Document 1-1   Filed 04/08/20   Page 41 of 49   COMMERCIAL UMBRELLA

**2.** Any person (other than your "employee" or "volunteer worker") or an organization while acting as your real estate manager.

**3.** Any person or organization having proper temporary custody of your property if you die, but only:

    **a.** With respect to liability arising out of the maintenance or use of that property; and
    **b.** Until your legal representative has been appointed.

**4.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and all of your duties under this policy.

**5.** Any other person or organization who is insured under the "controlling underlying insurance." The coverage afforded such insureds under this policy will be no broader than the "controlling underlying insurance" except for this policy's Limit of Insurance.

**C.** With respect to:

    **1.** An "auto"; or
    **2.** "Mobile equipment" registered in your name under a motor vehicle registration law;
To which the "controlling underlying insurance" applies, any person is an insured while driving such "auto" or "mobile equipment" along a public highway with your permission.

Other persons or organizations responsible for the conduct of such person(s) are also insureds, but only for their liability due to the operation of the "auto" or registered "mobile equipment."

However, the owner or anyone else from whom you hire or borrow an "auto" is an insured only if that "auto" is a trailer connected to an "auto" owned by you.
But no person or organization is an insured under this paragraph C. for:

    **a.** "Bodily injury" to a co-employee of the person driving the "auto" or "mobile equipment"; or
    **b.** "Property damage" to property owned by you or the employer of a person who is an insured under this provision; or
    **c.** An "auto" you hire or borrow from one of your partners, or "employees," or members of their households, if they are the owner of such "auto"; or
    **d.** An "auto" being used by a person employed in the business of selling, servicing, repairing, or parking "autos" unless they are your "employees"; or
    **e.** The movement of property to or from an "auto" except you, your "employees," partners, lessees, or borrowers of such auto and employees of the lessees or borrowers.

**D.** Any organization you newly acquire or form, other than a partnership, joint venture, or limited liability company, and over which you maintain ownership or majority interest, will be deemed to be a Named Insured, However:

    **1.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

    **2.** Coverage is applicable only in excess of the limits of the "underlying insurance" as shown in the Schedule of Underlying Insurance. You must add such organization to your "underlying insurance" as soon as possible, advising us of such additions. We may then make adjustment of premium charges.

    **3.** Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

    **4.** Coverage B does not apply to "personal and advertising injury" due to an "offense" committed before you acquired or formed the organization.

**E.** No person or organization is an insured with respect to the conduct of a current or past partnership, joint venture, or limited liability company that is not shown as a Named Insured in the Declarations.

## LIMITS OF INSURANCE

**A.** The Each Occurrence, Offense or Claim Limit stated in the Declarations is the most we will pay for the total of all "ultimate net loss" arising out of any one "occurrence," "offense" or "claim."

**B.** The limit stated in the Declarations for the Combined Aggregate Limit is the most we will pay under Section Insuring Agreements for all "ultimate net loss".

**C.** With respect to Coverage A and Coverage B, the Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

    **1.** Insureds;
    **2.** "Autos" or "mobile equipments";
    **3.** "Claims" made or "suits" brought;
    **4.** Persons or organizations making "claims" or bringing "suits"; or
    **5.** Coverage afforded under this policy.

**D.** If the applicable limits of "underlying insurance" are reduced or exhausted by payments from one or more "occurrences," "offenses," or "claims" the Limits of Insurance of this policy will apply in excess of such reduced or exhausted limits.

**E.** The Limits of Insurance of this policy apply to the policy period, including the extended reporting period, if applicable to all "underlying insurance" and if exercised pursuant to all "underlying insurance."

## POLICY CONDITIONS

### A. Appeals

If the insured or an "underlying insurer" elects not to appeal a judgment, which exceeds the "underlying limit," we may elect to do so. If we do so, we shall be liable, in addition to the Limit of Insurance, for all costs, taxes, expenses, and interest on judgments incidental to such an appeal. We shall also be liable for all such costs, expenses and interest on appeals in connection with our right and duty to defend the insured under Section Defense and Supplementary Payments Coverages A and B.

### B. Bankruptcy

Bankruptcy, insolvency, or receivership of the insured, or of the insured's estate, or of any "underlying insurer" will not relieve us of our obligations under this policy; however, with regard to bankruptcy, insolvency, or receivership of an "underlying insurer," this policy shall not apply as a replacement of such bankrupt or insolvent insurer. Our Limits of Insurance will apply only in excess of the limit(s) of insurance stated in the Schedule of Underlying Insurance of this policy.

### C. Cancellation

This policy may be cancelled by the Named Insured authorized to act on behalf of all of insureds by surrender thereof to us or to our underwriting manager, on behalf of us, or by mailing to the aforementioned written notice stating when thereafter such cancellation shall be effective. If cancelled by the Named Insured, we shall retain the customary short rate proportion of the premium.

This policy may be cancelled by us or by our underwriting manager, by mailing to the Named Insured authorized to act on behalf of all insureds at the address stated in the Declarations written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective. However, if we cancel the policy because the Named Insured authorized to act on behalf of all insureds has failed to pay a premium or deductible when due, including premium and deductible(s) due on any other policy(ies) issued by us or any of our affiliated companies in an uninterrupted series of policies for which this policy is a renewal or replacement, this policy may be cancelled by us by mailing a written notice of cancellation to the. Named Insured stating when, not less than ten (10) days thereafter, such cancellation shall be effective. The mailing of notice as aforementioned shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice by the Named Insured, us, or our underwriting manager shall be equivalent to mailing. If cancelled by us or

by our underwriting manager, earned premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

**D. Changes**

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of us shall not effect a waiver or a change in any part of this policy and shall not estop us from asserting any right under the terms of the policy. The terms of this policy shall not be waived or changed, except by written endorsement issued to form a part of this policy, and this policy embodies all agreements existing between the insureds and us or any of our agents relating to this insurance.

**E. Assignment of Interest**

We shall not be bound by an assignment of interest by any insured unless our consent to such assignment is endorsed onto this policy.

**F. Duties in the Event of an Occurrence, Offense, Claim, or Suit**

You must see to it that we and your "underlying insurers":

**1.** Are notified in writing as soon as practicable of any "occurrence" or "offense" which may result in a "claim" involving this insurance or any "underlying insurance";

**2.** Receive written notice of the "claim" as soon as practicable and of the "suit" immediately. Notice includes:
    **a.** How, when, and where the "occurrence" or alleged "offense" took place;
    **b.** The insured's name and address;
    **c.** The names and addresses of any injured persons and witnesses;
    **d.** The nature and location of any injury or damage arising out of the "occurrence" or "offense";
    **e.** Copies of any demands, notices, summonses, or legal papers received in connection with a "claim" or "suit" involving you or any other insured.

**3.** Are assisted, upon our request, in the enforcement of any right against any person or organization which may be liable to you or any other insured because of "bodily injury," "property damage," or "personal and advertising injury" to which this insurance may apply; and

**4.** Receive the insured's full cooperation in the investigation, adjustment, settlement, or defense of any "claim" or "suit," "occurrence" or "offense."

**G. Assistance and Cooperation**

The insured shall cooperate with us and upon our request, the insured shall: (1) submit to examination and interview by our representative, under oath if required; (2) attend hearings, depositions and trials; (3) assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses in the conduct of "suits"; (4) give a written statement or statements to our representatives and meet with such representatives for the purpose of determining coverage and investigating and/or defending any "claim"; (5) provide any information required to comply with federal or state reporting regulations; all without cost to us. The insured shall further cooperate with us and do whatever is necessary to secure and effect any right of indemnity, contribution or apportionment which the insured may have. The insured shall not, except at his/her own cost, make any payment, admit any liability, settle any "claim," assume any obligation or incur any expense without our written consent.

If denial of coverage by the "controlling underlying insurer" is legally upheld because of a breach of a policy condition by the insured and if said breach is not also a breach of a condition of this policy, the insurance afforded by this policy shall apply in the same manner as though such "controlling underlying insurance" had not been breached and had remained in full effect.

**H. Examination of Your Books and Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

Case 8:20-cv-00682-JVS-KES Document 12-4 Filed 05/04/20 Page 47 of 82 Page ID
Case 8:20-cv-00682-JVS-KES Document 1-1 Filed 04/08/20 Page 44 of 79 COMMERCIAL UMBRELLA
#:216

## I. Inspections and Surveys

**1.** We have the right but are not obligated to:

    **a.** Make inspections and surveys of your premises, operations, and equipment at any time;

    **b.** Give you reports on the conditions we find; and

    **c.** Recommend changes to those conditions.

**2.** Any inspections, surveys, reports, or recommendations we make relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public and we do not warrant the premises, operations, equipment, or conditions:

    **a.** Are safe or healthful; or

    **b.** Comply with laws, regulations, codes, or standards.

This condition applies not only to us, but also to any rating, advisory, rate service, or similar organization which makes insurance inspections, surveys, reports, or recommendations on our behalf.

## J. Legal Action Against Us

No action shall lie against us unless, as a condition precedent thereto, the insured shall have fully complied with all of the terms and conditions of this policy, nor until the amount of the insured's obligation to pay shall have been fully and finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and us.

Nothing contained in this policy shall give any person or organization any right to join us as a co-defendant in any action against the insured to determine the insured's liability. Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve us of any of our obligations hereunder.

An agreed settlement means a settlement and release of liability signed by us, the insured, and the claimant or the claimant's legal representative.

## K. Maintenance of Underlying Insurance

**1.** You must keep the "underlying insurance" stated in the Schedule of Underlying Insurance of this policy, including renewal or replacement policies not more restrictive in their terms and conditions, in full force and effect during the policy period of this policy. This also applies with respect to claims-made "underlying insurance" during any Extended Reporting Period of this policy. The limits of "underlying insurance" shall be unimpaired as of this policy's effective date and be maintained without reduction other than by payment of "damages" and "claim expenses" covered thereunder.

**2.** You must notify us immediately of any changes to the terms of any "underlying insurance" policy, including cancellation or replacement of such policy or policies by the "underlying insurer" or any other insurer. We may make adjustment of premium charges under this policy for the period from the effective date of such changes to the termination of any "underlying insurance" policies.

Your failure to comply with the foregoing shall not invalidate this policy; but, in the event of such failure, we shall be obligated only to the extent that we would have been obligated had the terms of the "underlying insurance" specified in the Schedule of Underlying Insurance been maintained in place.

## L. Other Insurance

**1.** We will pay only our share of the amount of "ultimate net loss", if any, that exceeds the sum of:

    **a.** The total amount that all such other insurance would pay in the absence of this insurance; and

    **b.** The total of all deductible and self-insured amounts under any other insurance.

**2.** This insurance is excess over any other insurance, whether such insurance is stated to be primary, excess, contributing, contingent, or on any other basis. This provision does not apply to such insurance specifically purchased to apply in excess of this policy's Limit of Insurance.

Case 8:20-cv-00682-JVS-KES   Document 12-4   Filed 05/04/20   Page 48 of 82   Page ID
Case 8:20-cv-00682-JVS-KES   Document 1-1   Filed 04/08/20   Page 45 of 49   COMMERCIAL UMBRELLA
#:217

3.  We will have no duty under Coverages A and B to defend any "claim" or "suit" that any other insurer has a duty to defend. If no other insurer defends, we may undertake to do so, but we will be subrogated to the insured's right against all other insurers.

4.  If the insured has another Excess or Umbrella Policy with us covering a "claim" also covered by this policy, the insured must elect which policy shall apply and we shall be obligated under the policy so elected and shall not be obligated under any other policy.

## M.  Premium Audit

1.  For policies issued on an adjustable basis (not a flat basis), upon expiration of this policy or its earlier termination date, the earned premium shall be computed on the basis of units of exposure times the rate. If the earned premium thus computed is more than the paid Deposit Premium stated in the Declarations, the insured shall immediately pay the excess to us; if less, we shall retain the Minimum Premium stated in the Declarations or the Policy Minimum Earned Premium stated in the Declarations, whichever is greater. The Policy Minimum Earned Premium is the smallest amount of premium that is fully earned in the event of cancellation, initiated by any party, prior to policy expiration.

2.  The first Named Insured must keep records of the information we need for premium computation, and must send us copies at such times as we may request.

3.  The first Named Insured shall cooperate in promptly providing to us the entire amount (or number) of such premium base during the whole or any specified part of the said period, including making their books available for verification and audit by our duly authorized representative of the information for a period of three years from the expiration date. If the insured fails to cooperate, we have the right to invoice an estimated audit which is due and payable immediately. The insured must pay all costs or expenses resulting from their failure to cooperate or their failure to pay an audit invoice. The providing of any estimate or statement or the making of any previous settlement shall not bar the examination herein provided for, nor our right to additional premium.

## N.  Authorization

By acceptance of this policy, the first Named Insured stated in Item 1. of the Declarations shall act on behalf of all insureds with respect to the giving and receiving of all notices to and from us as provided herein: the cancellation of this policy in whole or part; the payment of premiums and Deductibles when due; the receiving of any return premiums that may become due under this policy; and the insureds agree that such person or organization shall act on their behalf.

## O.  Representations

By acceptance of this policy, the insureds agree as follows:

1.  That the information and statements contained in the application(s) are the basis of this policy and are to be considered as incorporated into and constituting a part of this policy; and

2.  That the information and statements contained in the application(s) are their representations, that they shall be deemed material to the acceptance of the risk or hazard assumed by us under this policy, and that this policy is issued in reliance upon the truth of such representations.

## P.  Separation of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned to the first Named Insured, this insurance applies:

1.  As if each Named Insured were the only Named Insured; and
2.  Separately to each insured against whom a "claim" is made or a "suit" is brought.

Case 8:20-cv-00682-JVS-KES Document 12 Filed 05/04/20 Page 48 of 82 Page ID
Case 8:20-cv-00682-JVS-KES Document 11 Filed 04/08/20 Page 46 of 79 COMMERCIAL UMBRELLA
#:218

**Q. Transfer of Rights of Recovery Against Others to Us**

    **1.** If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair those rights. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce those rights.

    **2.** Any recoveries shall be applied first to reimburse any interests (including the insured) that have paid any amounts in excess of our liability under this policy; then to reimburse us for any payment hereunder; and lastly to reimburse such interests (including the insured) as to which this policy is excess, as are entitled to the remainder, if any.

    **3.** When we assist in pursuit of the insured's rights of recovery, resulting reasonable expenses shall be apportioned among all interests in the ratio of their respective losses for which recovery is sought.

**R. When "Ultimate Net Loss" Is Payable**

Our obligation for any portion of "ultimate net loss" shall not arise until the insured or any "underlying insurer" has paid the "underlying limit." In the event that a policy stated in the Schedule of Underlying Insurance includes a specific coverage which has a sublimit, a separate limit or a supplemental limit of less than $500,000 for Employer's Liability or less than $1,000,000 for any other "underlying insurance," this policy shall exclude any "occurrence," "offense" or "claim" to which such specific coverage applies and shall not drop down to afford coverage in excess of such sublimit, separate limit or supplemental limit.

**S. Service of Suit**

Except with respect to any policy issued in any state in which we are licensed as an admitted insurer to transact business, it is agreed that in the event of our failure to pay any amount claimed to be due hereunder, we, at your request, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of our rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Midwest, Ten Parkway North, Deerfield, Illinois 60015 and that in any suit instituted against us upon this policy, we will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, we hereby designate the Superintendent, Commissioner or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as our true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of you or any beneficiary hereunder arising out of this policy, and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

# EXTENDED REPORTING PERIOD

**A.** This Section applies to claims-made insurance under Coverages A and B.

    **1.** We will provide an Extended Reporting Period as described below, if the Extended Reporting Period is exercised pursuant to the "underlying insurance." We will also provide an Extended Reporting Period when our layer of insurance is not renewed or replaced by you or by us provided you maintain the "underlying insurance" for the duration of the Extended Reporting Period.

    **2.** The Extended Reporting Period is available, but only by an endorsement and for an additional charge. This Extended Reporting Period starts immediately at the end of the policy period and extends for the period of months as elected by the first Named Insured, but in no case will the Extended Reporting Period be for a longer duration than the Extended Reporting Period of the "underlying insurance" listed in the Schedule of Underlying Insurance.

    **3.** You must give us a written request for the endorsement within 30 days after the end of the policy period. The Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due and;

Case 8:20-cv-00682-JVS-KES Document 12-4 Filed 05/04/20 Page 50 of 82 Page ID
Case 8:20-cv-00682-JVS-KES Document 1-1 Filed 04/08/20 Page 47 of 49 COMMERCIAL UMBRELLA
#:219

a.   Maintain any "underlying insurance" in full force and effect as specified in Condition K., Maintenance of Underlying Insurance of this policy; or

b.   Purchase an Extended Reporting Period endorsement on any "underlying insurance" written on a claims-made basis.

The period of months for which the first Named Insured may exercise the Extended Reporting Period shall be as stated below:
**(1)**   12 months;
**(2)**   24 months;
**(3)**   36 months; or
**(4)**   48 months.

The additional premium for the Extended Reporting Period shall be determined by us in accordance with rates and rules in effect at the expiration of this policy period.

The endorsement shall set forth the terms, not inconsistent with this section, applicable to the Extended Reporting Period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other insurance available under policies in force after the Extended Reporting Period starts.

**4.**   Extended Reporting Periods do not extend the policy period or change the scope of coverage provided. They apply only to "claims" covered by this policy on a claims-made basis for "bodily injury" or "property damage" that occurs before the end of the policy period but not before the "retroactive date" shown in item 1. of the Declarations of this policy.

Once in effect, Extended Reporting Periods may not be cancelled unless "underlying insurance" is not maintained. If canceled due to the failure of the insured to maintain an "underlying insurance", return premium shall be determined by us based on the "underlying insurance" maintained relative to that not maintained.

**5.**   In addition to the availability of the Extended Reporting Period for the period of months stated in A.3. above, an Extended Reporting Period of the following duration shall also be available:

60 months;
72 months; or
84 months.

The first Named Insured must make a written request for the longer duration Extended Reporting Period received by us within 10 days after the end of the Policy Period. The written request must specify from the options stated above which period of Extended Reporting Period is requested. We will determine the additional premium to be charged for such Extended Reporting Period.

We will provide to the first Named Insured in writing the amount of the additional premium for an Extended Reporting Period of the duration specified within 10 days of receipt of the Named Insured's written request.

All other terms and conditions of the Section Extended Reporting Period shall apply with regard to the first Named Insured's exercise of any such longer duration Extended Reporting Period.

**6.**   Extended Reporting Periods do not reinstate or increase the Limits of Insurance.

## DEFINITIONS

**A.**   "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:
a.   Notices that are published include material placed on the Internet or on similar electronic means of communication; and
b.   Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

Case 8:20-cv-00682-JVS-KES   Document 12-4   Filed 05/04/20   Page 51 of 82   Page ID
#:220
Case 8:20-cv-00682-JVS-KES   Document 1-1   Filed 04/08/20   Page 48 of 79   **COMMERCIAL UMBRELLA**

**B.**  "Aircraft" means any heavier-than-air or lighter-than-air vehicle designed to travel principally in the air to transport persons or property. "Aircraft" does not mean hovercraft. "Aircraft" also includes any vehicle or device specifically designed for travel or use outside the earth's atmosphere.

**C.**  "Aggregate limit" means the maximum amount stated in the policy for which the insurer will be liable, regardless of the number of covered "claims."

**D.**  "Auto" means a land motor vehicle, trailer, or semi-trailer designed for travel on public roads, including attached machinery or equipment. However, "auto" does not include "mobile equipment."

**E.**  "Automobile hazard" means liability arising out of the ownership, maintenance, operation, use, "loading or unloading" of any "auto."

**F.**  "Bodily injury" means bodily injury, sickness, disease, shock, fright, mental injury, or disability sustained by a person, and includes death from any of these at any time.

**G.**  "Claim" means the insured's receipt of:
    **1.**  Any demand for "damages" or services; or
    **2.**  The service of "suit" papers or arbitration proceedings alleging liability of the insured, due to an "occurrence" or "offense" which may or may not be covered by this policy.
    "Claim" does not include reports of accidents, or "occurrences," or any acts, errors, "offenses" or omissions which may give rise to a "claim."

**H.**  "Claim expenses" means reasonable and necessary amounts incurred by us or by you with our prior written consent in the defense of that portion of any "claim" or "suit" for which coverage is afforded under this policy, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds, but without any obligation of us to apply for or furnish any such bonds, and costs of appeals; provided, however, "claim expenses" shall not include: (1) salary, wages, overhead, or benefit expenses of or associated with employees or officials of yours or our employees or officials; or (2) salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or captive out-of-house counsel for you or us.

**I.**  "Controlling underlying insurance" means the coverage(s) afforded under insurance policies designated in the Schedule of Underlying Insurance of this policy as "controlling underlying insurance" and any renewals or replacements of such policies. "Underlying insurance" also includes any other insurance available to the insured, except such insurance as may be purchased to apply specifically in excess of this policy.

**J.**  "Controlling underlying insurer" means an insurance company issuing a policy of "controlling underlying insurance."

**K.**  "Coverage territory" means anywhere in the world if the insured's responsibility to pay "damages" is determined in a "suit" on the merits, in the United States of America (including its territories and possessions), Puerto Rico, Canada, or in a settlement we agree to.

**L.**  "Damages" means the monetary portion of any judgment, award or settlement; provided, however, "damages" shall not include:
    **1.**  Punitive or exemplary damages or any multiplied portions of damages in excess of actual damages, including trebling of damages;
    **2.**  Taxes, criminal or civil fines, or attorneys' fees of a party other than an insured or other penalties imposed by law;
    **3.**  Sanctions;
    **4.**  Matters which are uninsurable under the law pursuant to which this policy shall be construed; or
    **5.**  The return, withdrawal, reduction or restitution or payment of fees, profits or charges for services or consideration and/or any expenses paid to the insured.

**M.**  "Employee" includes a "leased worker." "Employee" does not include a "temporary worker."

**N.**  "Executive officers" means a person holding any of the officer positions created by your charter, constitution, by-laws, or any similar governing document. "Executive officer" includes any other officer of the corporation.

**O.**  "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

Case 8:20-cv-00682-JVS-KES Document 12-4 Filed 05/04/20 Page 53 of 82 Page ID #:221
Case 8:20-cv-00682-JVS-KES Document 1-1 Filed 04/08/20 Page 49 of 78

COMMERCIAL UMBRELLA

1. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate, or dangerous; or
2. You have failed to fulfill the terms of a contract or agreement;

If such property can be restored to use by:

a. The repair, replacement, adjustment, or removal of "your product" or "your work"; or
b. Your fulfilling the term of the contract or agreement.

**P.** "Insured contract" means:
1. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";
2. A sidetrack agreement;
3. Any easement or license agreement in connection with vehicle or pedestrian private railroad crossings at grade; or
4. Any other easement agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;
5. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality.
6. An elevator maintenance contract; or
7. That part of any other contract or agreement pertaining to your business under which you assume the tort liability of another to pay "damages" because of "bodily injury" or "property damage" to a third person or organization, if the contract or agreement is made prior to the "bodily injury" or "property damage." Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

An "insured contract" does not include that part of any contract or agreement:

a. That indemnifies an architect, engineer, or surveyor for injury or damage arising out of:
   (1) Preparing, approving or failing to approve maps, drawings, opinions, reports, surveys, change orders, designs, or specifications; or
   (2) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage.
b. Under which the insured, if an architect, engineer, or surveyor, assumes liability for injury or damage arising out of the insured's rendering or failing to render professional services, including but not limited to those listed in a. above and supervisory, inspection, or engineering services; or
c. That indemnifies any person or organization for damage by fire to premises rented to you, loaned to you, or temporarily occupied by you.

**Q.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker."

**R.** "Loading or unloading" means the handling of property:
1. After it is moved from the place where it is accepted for movement into or onto an "aircraft," "watercraft," or "auto;"
2. While it is in or on an "aircraft," "watercraft," or "auto;" or
3. While it is being moved from an "aircraft," "watercraft," or "auto" to the place where it is finally delivered.

But "loading and unloading" does not include the movement of property by means of a mechanical device, other than a hand truck that is not attached to the "aircraft," "watercraft," or "auto."

**S.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:
1. Bulldozers, farm machinery, forklifts, and other vehicles designed for use principally off public roads;
2. Vehicles maintained for use solely on or next to premises you own or rent;
3. Vehicles that travel on crawler treads;
4. Vehicles, whether self-propelled or not, on which are permanently mounted:
   a. Power cranes, shovels, loaders, diggers, or drills; or
   b. Road construction or resurfacing equipment such as graders, scrapers, or rollers;
5. Vehicles not described in 1., 2., 3., or 4. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:
   a. Air compressors, pumps, and generators, including spraying, welding, building cleaning, geographical exploration, lighting, and well servicing equipment; or
   b. Cherry pickers and similar devices used to lift workers to heights;

**6.** Vehicles not described in 1., 2., 3., or 4. above maintained primarily for purposes other than the transportation of person or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**a.** Equipment designed primarily for:

   **(1)** Snow removal;

   **(2)** Road maintenance, but not construction or resurfacing;

   **(3)** Street cleaning;

**b.** Cherry pickers and similar devices mounted on automobile chassis and used to raise or lower workers; and

**c.** Air compressors, pumps, and generators, including spraying, welding, building cleaning, geographical exploration, lighting, and well servicing equipment.

**T.** "Occurrence" means:

**1.** With respect to "bodily injury" or "property damage" liability, an accident, including continuous or repeated exposure to substantially the same general harmful conditions; or

**2.** With respect to employees of the Named Insured, "bodily injury" caused by accident or disease.

**U.** "Offense" means any of the offenses included in the definition of "personal and advertising injury."

**V.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**1.** False arrest, detention or imprisonment;

**2.** Malicious prosecution;

**3.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**4.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**5.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**6.** The use of another's advertising idea in your "advertisement"; or

**7.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**W.** "Pre-judgment interest" means interest added to a settlement, verdict, award, or judgment based on the amount of time prior to the settlement, verdict, award, or judgment whether or not made part of the settlement, verdict, award, or judgment.

**X.** "Products-completed operations hazard:"

**1.** "Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you own or rent and caused by or arising out of "your product" or "your work" except:

**a.** Products that are still in your physical possession; or

**b.** Work that has not yet been completed or abandoned.

**2.** "Your work" will be deemed completed at the earliest of the following times:

**a.** When all work called for in your contract has been completed;

**b.** When all of the work to be done at the site has been completed if your contract calls for work at more than one site; or

**c.** When that part of the work done at a job site has been put to its intended use by an person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair, or replacement, but which is otherwise complete, will be treated as completed.

**3.** This hazard does not include "bodily injury" or "property damage" caused by or arising out of:

**a.** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it;

**b.** The existence of tools, uninstalled equipment, or abandoned or unused materials.

**Y.** "Property damage" means:

**1.** Physical injury to tangible property, including all resulting loss of use of that property; or

Case 8:20-cv-00682-JVS-KES   Document 12-4   Filed 05/04/20   Page 54 of 82   Page ID
#:223
Case 8:20-cv-00682-JVS-KES   Document 1-1   Filed 04/08/20   Page 91 of 119   COMMERCIAL UMBRELLA

**2.** Loss of use of tangible property that is not physically injured or destroyed. All such loss of use shall be deemed to occur at the time the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**Z.** "Retained limit" means the amount of "underlying insurance" applicable to a "claim" or "suit," whether such "underlying insurance" is collectible or not.

**AA.** "Retroactive date" means the retroactive date stated in item 3. of the Declarations of this policy.

**BB.** "Suit" means a civil proceeding in which "damages" because of "bodily injury," "property damage," "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes any arbitration proceeding alleging such "damages" to which you must submit or submit with your consent, or any other alternative dispute resolution proceeding in which "damages" are claimed and to which you submit with our consent.

**CC.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**DD.** "Ultimate net loss" means the total amount of "damages" for which the insured is legally liable in payment of "bodily injury", "property damage", "personal and advertising injury." "Ultimate net loss" shall include "claim expenses" we incur with respect to any "bodily injury", "property damage", "personal and advertising injury" subject to coverage under this policy, if "claim expenses" of the "underlying insurer(s)" with respect to such "bodily injury", "property damage", "personal and advertising injury" reduce the limits of "underlying insurance" of the policy listed in the Schedule of Underlying Insurance applicable to such "bodily injury", "property damage", "personal and advertising injury." "Ultimate net loss" may be established by adjudication, arbitration, or a compromise settlement to which we have previously agreed in writing. "Ultimate net loss" shall be reduced by any recoveries or salvages which have been paid or will be collected, but the amount of "ultimate net loss" shall not include any other expenses incurred by an insured, by us, or by any "underlying insurer."

**EE.** "Underlying insurance" means the coverage(s) afforded under insurance policies designated in the Schedule of Underlying Insurance of this policy and any renewals or replacements of such policies. "Underlying insurance" also includes any other insurance available to the insured, except such insurance as may be purchased to apply specifically in excess of this policy.

**FF.** "Underlying insurer" means an insurance company issuing a policy of "underlying insurance."

**GG.** "Underlying limit" means the limit of insurance stated in the Schedule of Underlying Insurance of this policy.

**HH.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**II.** "Watercraft" means a vehicle designed to travel principally on or under water. "Watercraft" includes hovercraft.

**JJ.** "Your product" means:
   **1.** Any goods or products, other than real property, manufactured, sold, handled, distributed, or disposed of by:
      **a.** You;
      **b.** Others trading under your name; or
      **c.** A person or organization whose business or assets you have acquired; and
   **2.** Containers (other than vehicles), materials, parts, or equipment furnished in connection with such goods or products.
   "Your product" includes warranties or representations made at any time with respect to the fitness, quality, durability, or performance of any of the items included in 1., or 2. above.
   "Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

**KK.** "Your work" means:

    **1.**    Work or operations performed by you or on your behalf; and

    **2.**    Material, parts, or equipment furnished in connection with such work or operations.

"Your work" includes warranties or representations made at any time with respect to the fitness, quality, durability, or performance of any of the items included in 1. or 2. above.

Case 8:20-cv-00682-JVS-KES Document 12-4 Filed 05/04/20 Page 56 of 82 Page ID
Case 8:20-cv-00682-JVS-KES Document 1-1 Filed 04/08/20 Page 93 of 115 Page ID
#:225



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – UNMANNED AIRCRAFT

This endorsement modifies insurance provided under the following:

HEALTH CARE UMBRELLA LIABILITY POLICY

In consideration of the premium paid, it is understood and agreed that the policy is amended as follows:

1. Section EXCLUSIONS A.4. is deleted and replaced as follows:

   4. "Bodily injury" or "property damage" arising out of the ownership, maintenance, operation, use, loading, unloading, or entrustment to others of an "aircraft" other than an "unmanned aircraft" or a "watercraft" owned or operated by, or chartered, rented, or loaned to any insured, except to the extent that coverage is provided by a policy listed in the Schedule of Underlying Insurance and then only to the extent provided by such policy or policies.

2. Section EXCLUSIONS C. is amended by the addition of the following exclusion:

   Coverages A and B of this policy do not apply to:

   "Ultimate net loss" arising out of or in connection with the ownership, maintenance, operation, use or entrustment to others of an "unmanned aircraft." Solely for purposes of this exclusion, "use" includes operation of or exercise of any control over an "unmanned aircraft"; and the insured's authorization, direction or acquiescence in the operation or control of "unmanned aircraft" by any person or entity; and "loading or unloading" of any such "unmanned aircraft." This exclusion applies even if any such "claim" alleges negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by the insured, if the "occurrence" which caused the "bodily injury" or "property damage" or the "offense" which caused the "personal and advertising injury" involved the ownership, maintenance, use or entrustment to others of any "unmanned aircraft."

3. Section DEFINITIONS B. and R. are deleted and replaced as follows:

   **B.** "Aircraft" means any heavier-than-air or lighter-than-air vehicle designed to travel principally in the air to transport persons or property. "Aircraft" does not mean hovercraft or "unmanned aircraft." "Aircraft" also includes any vehicle or device specifically designed for travel or use outside the earth's atmosphere.

   **R.** "Loading or unloading" means the handling of property:
   1. After it is moved from the place where it is accepted for movement into or onto an "aircraft," "unmanned aircraft," "watercraft," or "auto;"
   2. While it is in or on an "aircraft," "unmanned aircraft," "watercraft," or "auto;" or
   3. While it is being moved from an "aircraft," "unmanned aircraft," "watercraft," or "auto" to the place where it is finally delivered.

   But "loading and unloading" does not include the movement of property by means of a mechanical device, other than a hand truck that is not attached to the "aircraft," "unmanned aircraft," "watercraft," or "auto."

2. Section DEFINITIONS is amended by the addition of the following:

   "Unmanned aircraft" means an aircraft that is not designed, manufactured, or modified after manufacture, to be controlled directly by a person from within or on the aircraft.

All other terms and conditions remain unchanged.

**MEHX 2302 05 15**    Includes copyrighted material of Insurance Services Office, Inc. with its permission.    **Page 1 of 1**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SERVICE OF SUIT - CALIFORNIA

It is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Todd Crouch, Fraser Watson Crouch LLP, 100 West Broadway, Suite 650, Glendale, CA 91210-1201 and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner, or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as to whom the said officer is authorized to mail such process or a true copy thereof.

Pursuant to Section 1772, et seq., of the California Insurance Code, a surplus line insurer may be sued upon any cause of action arising in this state under any surplus line insurance contract made by it, or any evidence of insurance issued or delivered by the surplus line broker, pursuant to the procedures set forth in Sections 1610 to 1620, inclusive.

Case 8:20-cv-00682-JVS-KES Document 12-4 Filed 05/04/20 Page 58 of 82 Page ID
Case 8:20-cv-00682-JVS-KES Document 1-1 Filed 04/08/20 Page 95 of 119 Page ID #:99
#:227



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CERTIFIED ACTS OF TERRORISM COVERAGE

This endorsement modifies insurance provided under the following:

HEALTH CARE UMBRELLA LIABILITY POLICY
SPECIFIED MEDICAL PROFESSIONS EXCESS GENERAL LIABILITY INSURANCE POLICY

It is agreed that the following is added:

**Certified Acts of Terrorism**

It is hereby understood and agreed that this policy includes coverage on account of any "ultimate net loss" in excess of the "underlying limit" resulting from any "certified act of terrorism." Notwithstanding the foregoing, if no coverage is afforded by an applicable policy of "underlying insurance" for any "certified act of terrorism," this policy shall not drop down but shall apply to "ultimate net loss" in excess of the "underlying limit" of the applicable "underlying insurance" as if such "underlying insurance" had included coverage for any "certified act of terrorism." We shall be obligated only to the extent that we would have been obligated had you effected coverage for any "certified act of terrorism" under such applicable "underlying insurance."

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The federal Terrorism Risk Insurance Act set forth the following criteria for a "certified act of terrorism":

1. The act resulted in insured losses in excess of $5 million in the aggregate attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and
2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If the aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Calendar Year and the Insurer has met the Insurer's deductible under the Terrorism Risk Insurance Act, the Insurer shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such cases insured losses up to that amount are subject to pro rata allocation in accordance with the procedures established by the Secretary of the Treasury.

The terms and limitations of any terrorism coverage provided therewith, or the inapplicability or omission of terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this policy.

All other terms and conditions remain unchanged.

**MEIL 5231 01 15**                                                                                   **Page 1 of 1**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TRADE OR ECONOMIC SANCTIONS

The following is added to this policy:

**Trade Or Economic Sanctions**

This insurance does not provide any coverage, and we (the Company) shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us (the Company) to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited to, those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms and conditions remain unchanged.

# COMMERCIAL INSURANCE APPLICATION
## APPLICANT INFORMATION SECTION

**DATE (MM/DD/YYYY)** 06/04/2019

| AGENCY | CARRIER Evanston | NAIC CODE |
|---|---|---|

| | COMPANY POLICY OR PROGRAM NAME | PROGRAM CODE |
|---|---|---|

| | POLICY NUMBER |
|---|---|

| **CONTACT NAME:** | UNDERWRITER | UNDERWRITER OFFICE |
|---|---|---|
| **PHONE (A/C, No, Ext):** | | |
| **FAX (A/C, No):** | | |
| **E-MAIL ADDRESS:** | **STATUS OF TRANSACTION** | ☑ QUOTE   ☐ ISSUE POLICY   ☐ RENEW |
| **CODE:**        **SUBCODE:** | | ☐ BOUND (Give Date and/or Attach Copy): |
| **AGENCY CUSTOMER ID:** | | ☐ CHANGE   **DATE**   **TIME**   ☐ AM |
| | | ☐ CANCEL   ☐ PM |

## SECTIONS ATTACHED

| INDICATE SECTIONS ATTACHED | PREMIUM | | PREMIUM | | PREMIUM |
|---|---|---|---|---|---|
| ☐ ACCOUNTS RECEIVABLE / VALUABLE PAPERS | $ | ☐ ELECTRONIC DATA PROC | $ | ☐ TRANSPORTATION / MOTOR TRUCK CARGO | $ |
| ☐ BOILER & MACHINERY | $ | ☐ EQUIPMENT FLOATER | $ | ☐ TRUCKERS / MOTOR CARRIER | $ |
| ☐ BUSINESS AUTO | $ | ☐ GARAGE AND DEALERS | $ | ☐ UMBRELLA | $ |
| ☐ BUSINESS OWNERS | $ | ☐ GLASS AND SIGN | $ | ☐ YACHT | $ |
| ☑ COMMERCIAL GENERAL LIABILITY | $ | ☐ INSTALLATION / BUILDERS RISK | $ | ☑ professional liability | $ |
| ☐ CRIME / MISCELLANEOUS CRIME | $ | ☐ OPEN CARGO | $ | ☐ | $ |
| ☐ DEALERS | $ | ☐ PROPERTY | $ | ☐ | $ |

## ATTACHMENTS

| | | |
|---|---|---|
| ☐ ADDITIONAL INTEREST | ☐ PREMIUM PAYMENT SUPPLEMENT | ☐ |
| ☐ ADDITIONAL PREMISES | ☐ PROFESSIONAL LIABILITY SUPPLEMENT | ☐ |
| ☐ APARTMENT BUILDING SUPPLEMENT | ☐ RESTAURANT / TAVERN SUPPLEMENT | ☐ |
| ☐ CONDO ASSN BYLAWS (for D&O Coverage only) | ☐ STATEMENT / SCHEDULE OF VALUES | ☐ |
| ☐ CONTRACTORS SUPPLEMENT | ☐ STATE SUPPLEMENT (If applicable) | ☐ |
| ☐ COVERAGES SCHEDULE | ☐ VACANT BUILDING SUPPLEMENT | ☐ |
| ☐ DRIVER INFORMATION SCHEDULE | ☐ VEHICLE SCHEDULE | ☐ |
| ☐ INTERNATIONAL LIABILITY EXPOSURE SUPPLEMENT | | ☐ |
| ☐ INTERNATIONAL PROPERTY EXPOSURE SUPPLEMENT | | ☐ |
| ☐ LOSS SUMMARY | | ☐ |

## POLICY INFORMATION

| PROPOSED EFF DATE | PROPOSED EXP DATE | BILLING PLAN | PAYMENT PLAN | METHOD OF PAYMENT | AUDIT | DEPOSIT | MINIMUM PREMIUM | POLICY PREMIUM |
|---|---|---|---|---|---|---|---|---|
| 07/25/19 | 07/25/20 | ☐ DIRECT  ☑ AGENCY | | | | $ | $ | $ |

## APPLICANT INFORMATION   (mailing address only)

| NAME (First Named Insured) AND MAILING ADDRESS (including ZIP+4) | GL CODE | SIC | NAICS | FEIN OR SOC SEC # |
|---|---|---|---|---|
| Footprints Behavioral Interventions Inc & Footprints Behavorial Health Corp. | | | | 20-8460477 |
| 11037 Warner Ave  #339 | BUSINESS PHONE #: | (714) 328-0979- | | |
| Fountain Valley        CA     92708 | WEBSITE ADDRESS | | | |

☑ CORPORATION   ☐ JOINT VENTURE   ☐ NOT FOR PROFIT ORG   ☐ SUBCHAPTER "S" CORPORATION   ☐
☐ INDIVIDUAL   ☐ LLC NO. OF MEMBERS AND MANAGERS:   ☐ PARTNERSHIP   ☐ TRUST

| NAME (Other Named Insured) AND MAILING ADDRESS (including ZIP+4) | GL CODE | SIC | NAICS | FEIN OR SOC SEC # |
|---|---|---|---|---|
| | | | | |
| | BUSINESS PHONE #: | | | |
| | WEBSITE ADDRESS | | | |

☐ CORPORATION   ☐ JOINT VENTURE   ☐ NOT FOR PROFIT ORG   ☐ SUBCHAPTER "S" CORPORATION   ☐
☐ INDIVIDUAL   ☐ LLC NO. OF MEMBERS AND MANAGERS:   ☐ PARTNERSHIP   ☐ TRUST

| NAME (Other Named Insured) AND MAILING ADDRESS (including ZIP+4) | GL CODE | SIC | NAICS | FEIN OR SOC SEC # |
|---|---|---|---|---|
| | | | | |
| | BUSINESS PHONE #: | | | |
| | WEBSITE ADDRESS | | | |

☐ CORPORATION   ☐ JOINT VENTURE   ☐ NOT FOR PROFIT ORG   ☐ SUBCHAPTER "S" CORPORATION   ☐
☐ INDIVIDUAL   ☐ LLC NO. OF MEMBERS AND MANAGERS:   ☐ PARTNERSHIP   ☐ TRUST

ACORD 125 (2013/09) QF

Page 1 of 4

© 1993-2013 ACORD CORPORATION.  All rights reserved.
The ACORD name and logo are registered marks of ACORD

AGENCY CUSTOMER ID: Autism footprints

## CONTACT INFORMATION

| CONTACT TYPE: | Kristine Carillo..... | | CONTACT TYPE: | |
|---|---|---|---|---|
| CONTACT NAME: | 714-8488319 | | CONTACT NAME: | |
| PRIMARY PHONE # | HOME | ✓ BUS | CELL | SECONDARY PHONE # | HOME | BUS | CELL | PRIMARY PHONE # | HOME | BUS | CELL | SECONDARY PHONE # | HOME | BUS | CELL |

| PRIMARY E-MAIL ADDRESS: | info@autismfootprints.com |
|---|---|
| SECONDARY E-MAIL ADDRESS: | |

| PRIMARY E-MAIL ADDRESS: | |
|---|---|
| SECONDARY E-MAIL ADDRESS: | |

## PREMISES INFORMATION  (Attach ACORD 823 for Additional Premises)

| LOC # | STREET | CITY LIMITS | INTEREST | # FULL TIME EMPL | ANNUAL REVENUES: $ |
|---|---|---|---|---|---|
| 2 | 1901 E Carnegie Ave ..Unit 1-C | ✓ INSIDE | OWNER | | OPEN TO PUBLIC AREA: SQ FT |
| BLD # | CITY: Santa Ana | STATE: CA | OUTSIDE | TENANT | # PART TIME EMPL | OCCUPIED AREA: SQ FT |
| | COUNTY: | ZIP 92705: | | | | TOTAL BUILDING AREA: SQ FT |
| DESCRIPTION OF OPERATIONS:   MAIN LOCATION | | | | | ANY AREA LEASED TO OTHERS? Y / N |

| LOC # | STREET | CITY LIMITS | INTEREST | # FULL TIME EMPL | ANNUAL REVENUES: $ |
|---|---|---|---|---|---|
| 3 | 1931 Vineyard  #100 | ✓ INSIDE | OWNER | | OPEN TO PUBLIC AREA: SQ FT |
| BLD # | CITY: XXXXXXX Wailuku    96783 | HI | OUTSIDE | TENANT | # PART TIME EMPL | OCCUPIED AREA: SQ FT |
| 1 | COUNTY: | ZIP XXXXX: | | | | TOTAL BUILDING AREA: SQ FT |
| DESCRIPTION OF OPERATIONS: | | | | | ANY AREA LEASED TO OTHERS? Y / N |

| LOC # | STREET | CITY LIMITS | INTEREST | # FULL TIME EMPL | ANNUAL REVENUES: $ |
|---|---|---|---|---|---|
| 4 | 2752 Woodlawn Dr #5-202 | ✓ INSIDE | OWNER | | OPEN TO PUBLIC AREA: SQ FT |
| BLD # | CITY: Honolulu | STATE: HI | OUTSIDE | TENANT | # PART TIME EMPL | OCCUPIED AREA: SQ FT |
| 1 | COUNTY: | ZIP: 96822 | | | | TOTAL BUILDING AREA: SQ FT |
| DESCRIPTION OF OPERATIONS: | | | | | ANY AREA LEASED TO OTHERS? Y / N |

| LOC # | STREET | CITY LIMITS | INTEREST | # FULL TIME EMPL | ANNUAL REVENUES: $ |
|---|---|---|---|---|---|
| 5 | 3535 N Lambert St | ✓ INSIDE | OWNER | | OPEN TO PUBLIC AREA: SQ FT |
| BLD # | CITY: Portland | STATE: OR | OUTSIDE | TENANT | # PART TIME EMPL | OCCUPIED AREA: SQ FT |
| 1 | COUNTY: | ZIP: 96814 | | | | TOTAL BUILDING AREA: SQ FT |
| DESCRIPTION OF OPERATIONS: | | | | | ANY AREA LEASED TO OTHERS? Y / N |

## NATURE OF BUSINESS

| | | | | | DATE BUSINESS STARTED (MM/DD/YYYY) |
|---|---|---|---|---|---|
| APARTMENTS | CONTRACTOR | MANUFACTURING | RESTAURANT | SERVICE | |
| CONDOMINIUMS | INSTITUTIONAL | OFFICE | RETAIL | WHOLESALE | |

**DESCRIPTION OF PRIMARY OPERATIONS**

Mental health counsellors that deal mainly  with small children and young adults up to 21 years of age.

#6.....1174 Cornucopia #110    Salem OR 97304
#7...2535 Camino Del South #155...San Diego CA 92108
8...7902 NE St Johns Rd ...Suite 106...Vancouver, WA 98655
9...30233 Southfield Rd 100...Southfield, MI 48076

| RETAIL STORES OR SERVICE OPERATIONS % OF TOTAL SALES: | INSTALLATION, SERVICE OR REPAIR WORK % | OFF PREMISES INSTALLATION, SERVICE OR REPAIR WORK % |
|---|---|---|

**DESCRIPTION OF OPERATIONS OF OTHER NAMED INSUREDS**

## ADDITIONAL INTEREST (Not all fields apply to all scenarios - provide only the necessary data)  Attach ACORD 45 for more Additional Interests

| INTEREST | | NAME AND ADDRESS  RANK: | EVIDENCE: | CERTIFICATE | POLICY | SEND BILL | INTEREST IN ITEM NUMBER | |
|---|---|---|---|---|---|---|---|---|
| ADDITIONAL INSURED | LOSS PAYEE | | | | | | LOCATION: | BUILDING: |
| BREACH OF WARRANTY | MORTGAGEE | | | | | | VEHICLE: | BOAT: |
| CO-OWNER | OWNER | | | | | | AIRPORT: | AIRCRAFT: |
| EMPLOYEE AS LESSOR | REGISTRANT | | | | | | ITEM CLASS: | ITEM: |
| LEASEBACK OWNER | TRUSTEE | | | | | | ITEM DESCRIPTION | |
| LIENHOLDER | | REFERENCE / LOAN #: | | INTEREST END DATE: | | | | |
| | | LIEN AMOUNT: | | PHONE (A/C, No, Ext): | | | FAX (A/C, No): | |
| REASON FOR INTEREST: | | | | E-MAIL ADDRESS: | | | | |

**ACORD 125 (2013/09) QF**                    Page 2 of 4

## GENERAL INFORMATION

| EXPLAIN ALL "YES" RESPONSES | Y / N |
|---|---|
| **1a.** IS THE APPLICANT A SUBSIDIARY OF ANOTHER ENTITY ? | N |

| PARENT COMPANY NAME | RELATIONSHIP DESCRIPTION | % OWNED |
|---|---|---|
| | | |

| **1b.** DOES THE APPLICANT HAVE ANY SUBSIDIARIES? | N |
|---|---|

| SUBSIDIARY COMPANY NAME | RELATIONSHIP DESCRIPTION | % OWNED |
|---|---|---|
| | | |

**2.** IS A FORMAL SAFETY PROGRAM IN OPERATION?   N
- [x] SAFETY MANUAL
- [ ] MONTHLY MEETINGS
- [ ] SAFETY POSITION
- [ ] OSHA

**3.** ANY EXPOSURE TO FLAMMABLES, EXPLOSIVES, CHEMICALS?   N

**4.** ANY OTHER INSURANCE WITH THIS COMPANY?  (List policy numbers)   N

| LINE OF BUSINESS | POLICY NUMBER | LINE OF BUSINESS | POLICY NUMBER |
|---|---|---|---|
| | | | |

**5.** ANY POLICY OR COVERAGE DECLINED, CANCELLED OR NON-RENEWED DURING THE PRIOR THREE (3) YEARS FOR ANY PREMISES OR OPERATIONS?  (Missouri Applicants - Do not answer this question)   N
- [ ] NON-PAYMENT
- [ ] AGENT NO LONGER REPRESENTS CARRIER
- [ ] NON-RENEWAL
- [ ] UNDERWRITING
- [ ] CONDITION CORRECTED (Describe):

**6.** ANY PAST LOSSES OR CLAIMS RELATING TO SEXUAL ABUSE OR MOLESTATION ALLEGATIONS, DISCRIMINATION OR NEGLIGENT HIRING?   N

**7.** DURING THE LAST FIVE YEARS (TEN IN RI), HAS ANY APPLICANT BEEN INDICTED FOR OR CONVICTED OF ANY DEGREE OF THE CRIME OF FRAUD, BRIBERY, ARSON OR ANY OTHER ARSON-RELATED CRIME IN CONNECTION WITH THIS OR ANY OTHER PROPERTY?
(In RI, this question must be answered by any applicant for property insurance.  Failure to disclose the existence of an arson conviction is a misdemeanor punishable by a sentence of up to one year of imprisonment).   N

**8.** ANY UNCORRECTED FIRE AND/OR SAFETY CODE VIOLATIONS?   N

| OCCURRENCE DATE | EXPLANATION | RESOLUTION | RESOLUTION DATE |
|---|---|---|---|
| | | | |

**9.** HAS APPLICANT HAD A FORECLOSURE, REPOSSESSION, BANKRUPTCY OR FILED FOR BANKRUPTCY DURING THE LAST FIVE (5) YEARS?   N

| OCCURRENCE DATE | EXPLANATION | RESOLUTION | RESOLUTION DATE |
|---|---|---|---|
| | | | |

**10.** HAS APPLICANT HAD A JUDGEMENT OR LIEN DURING THE LAST FIVE (5) YEARS?   N

| OCCURRENCE DATE | EXPLANATION | RESOLUTION | RESOLUTION DATE |
|---|---|---|---|
| | | | |

**11.** HAS BUSINESS BEEN PLACED IN A TRUST?   N

| NAME OF TRUST |
|---|
| |

**12.** ANY FOREIGN OPERATIONS, FOREIGN PRODUCTS DISTRIBUTED IN USA, OR US PRODUCTS SOLD/DISTRIBUTED IN FOREIGN COUNTRIES?
(If "YES", attach ACORD 815 for Liability Exposure and/or ACORD 816 for Property Exposure)   N

**13.** DOES APPLICANT HAVE OTHER BUSINESS VENTURES FOR WHICH COVERAGE IS NOT REQUESTED?   N

## REMARKS / PROCESSING INSTRUCTIONS (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

## PRIOR CARRIER INFORMATIO

| YEAR | CATEGORY | GENERAL LIABILITY | AUTOMOBILE | PROPERTY | OTHER: |
|---|---|---|---|---|---|
| | CARRIER | Enanston Inc Co | | | |
| | POLICY NUMBER | SM901807 | | | |
| 2016 | PREMIUM | $ 3903 | $ | $ | $ |
| | EFFECTIVE DATE | 07/25/2013 | | | |
| | EXPIRATION DATE | 07/25/2019 | | | |

**ACORD 125 (2013/09) QF**          **Page 3 of 4**

## PRIOR CARRIER INFORMATION

| YEAR | CATEGORY | GENERAL LIABILITY | AUTOMOBILE | PROPERTY | OTHER: |
|---|---|---|---|---|---|
| | CARRIER | | | | |
| | POLICY NUMBER | | | | |
| | PREMIUM | $ | $ | $ | $ |
| | EFFECTIVE DATE | | | | |
| | EXPIRATION DATE | | | | |
| | CARRIER | | | | |
| | POLICY NUMBER | | | | |
| | PREMIUM | $ | $ | $ | $ |
| | EFFECTIVE DATE | | | | |
| | EXPIRATION DATE | | | | |

## LOSS HISTORY

☑ **Check if none** **(Attach Loss Summary for Additional Loss Information)**

ENTER ALL CLAIMS OR LOSSES (REGARDLESS OF FAULT AND WHETHER OR NOT INSURED) OR OCCURRENCES THAT MAY GIVE RISE TO CLAIMS FOR THE LAST _____ YEARS

**TOTAL LOSSES:** $

| DATE OF OCCURRENCE | LINE | TYPE / DESCRIPTION OF OCCURRENCE OR CLAIM | DATE OF CLAIM | AMOUNT PAID | AMOUNT RESERVED | SUBRO-GATION Y / N | CLAIM OPEN Y / N |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

## SIGNATURE

☐ Copy of the Notice of Information Practices (Privacy) has been given to the applicant. (Not required in all states, contact your agent or broker for your state's requirements.)

PERSONAL INFORMATION ABOUT YOU, INCLUDING INFORMATION FROM A CREDIT OR OTHER INVESTIGATIVE REPORT, MAY BE COLLECTED FROM PERSONS OTHER THAN YOU IN CONNECTION WITH THIS APPLICATION FOR INSURANCE AND SUBSEQUENT AMENDMENTS AND RENEWALS. SUCH INFORMATION AS WELL AS OTHER PERSONAL AND PRIVILEGED INFORMATION COLLECTED BY US OR OUR AGENTS MAY IN CERTAIN CIRCUMSTANCES BE DISCLOSED TO THIRD PARTIES WITHOUT YOUR AUTHORIZATION. CREDIT SCORING INFORMATION MAY BE USED TO HELP DETERMINE EITHER YOUR ELIGIBILITY FOR INSURANCE OR THE PREMIUM YOU WILL BE CHARGED. WE MAY USE A THIRD PARTY IN CONNECTION WITH THE DEVELOPMENT OF YOUR SCORE. YOU MAY HAVE THE RIGHT TO REVIEW YOUR PERSONAL INFORMATION IN OUR FILES AND REQUEST CORRECTION OF ANY INACCURACIES. YOU MAY ALSO HAVE THE RIGHT TO REQUEST IN WRITING THAT WE CONSIDER EXTRAORDINARY LIFE CIRCUMSTANCES IN CONNECTION WITH THE DEVELOPMENT OF YOUR CREDIT SCORE. THESE RIGHTS MAY BE LIMITED IN SOME STATES. PLEASE CONTACT YOUR AGENT OR BROKER TO LEARN HOW THESE RIGHTS MAY APPLY IN YOUR STATE OR FOR INSTRUCTIONS ON HOW TO SUBMIT A REQUEST TO US FOR A MORE DETAILED DESCRIPTION OF YOUR RIGHTS AND OUR PRACTICES REGARDING PERSONAL INFORMATION. (Not applicable in AZ, CA, DE, KS, MA, MN, ND, NY, OR, VA, or WV. Specific ACORD 38s are available for applicants in these states.) **(Applicant's Initials:** _____

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects that person to criminal and civil penalties (In Oregon, the aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). (In New York, the civil penalty is not to exceed five thousand dollars ($5,000) and the stated value of the claim for each such violation). **(Not applicable in AL, AR, AZ, CO, DC, FL, KS, LA, ME, MD, MN, NM, OK, PR, RI, TN, VA, VT, WA and WV).**

**Applicable in AL AR, AZ, DC, LA, MD, NM, RI and WV:** Any person who knowingly (or willfully in MD) presents a false or fraudulent claim for payment of a loss or benefit or who knowingly (or willfully in MD) presents false information in an application for insurance is guilty of a crime and may be subject to fines or confinement in prison.

**Applicable in Colorado:** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the department of regulatory agencies.

**Applicable in Florida and Oklahoma:** Any person who knowingly and with intent to injure, defraud, or decieve any insurer files with a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony (In FL, a person is guilty of a felony of the third degree).

**Applicable in Kansas:** Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act.

**Applicable in Maine, Tennessee, Virginia and Washington:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**Applicable in Puerto Rico:** Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less that five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. should aggravating circumstances be present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

THE UNDERSIGNED IS AN AUTHORIZED REPRESENTATIVE OF THE APPLICANT AND REPRESENTS THAT REASONABLE INQUIRY HAS BEEN MADE TO OBTAIN THE ANSWERS TO QUESTIONS ON THIS APPLICATION. HE/SHE REPRESENTS THAT THE ANSWERS ARE TRUE, CORRECT AND COMPLETE TO THE BEST OF HIS/HER KNOWLEDGE.

| PRODUCER'S SIGNATURE | PRODUCER'S NAME (Please Print) | STATE PRODUCER LICENSE NO (Required in Florida) |
|---|---|---|
| | | |

| APPLICANT'S SIGNATURE | | DATE | NATIONAL PRODUCER NUMBER |
|---|---|---|---|
| | | | |

**ACORD 125 (2013/09) QF**  Page 4 of 4

AGENCY CUSTOMER ID: footprints

# COMMERCIAL GENERAL LIABILITY SECTION

**ACORD**

| | |
|---|---|
| DATE (MM/DD/YYYY) | 06/04/19 |

| AGENCY | CARRIER | NAIC CODE |
|---|---|---|
| | Evanston | |

| POLICY NUMBER | EFFECTIVE DATE | APPLICANT / FIRST NAMED INSURED |
|---|---|---|
| SM-901807 | 07/25/19 | Footprints Behavioral Interventions Inc |

## COVERAGES

| | | LIMITS | | PREMIUMS |
|---|---|---|---|---|
| ☐ COMMERCIAL GENERAL LIABILITY | | GENERAL AGGREGATE $ | 3,000,000.00 | PREMISES/OPERATIONS |
| ☑ CLAIMS MADE ☐ OCCURRENCE | | LIMIT APPLIES PER: ☑ POLICY ☐ LOCATION | | |
| ☐ OWNER'S & CONTRACTOR'S PROTECTIVE | | ☐ PROJECT ☐ OTHER: | | |
| | | PRODUCTS & COMPLETED OPERATIONS AGGREGATE $ | 1,000,000.00 | PRODUCTS |
| **DEDUCTIBLES** | | PERSONAL & ADVERTISING INJURY $ | 1,000,000.00 | |
| ☐ PROPERTY DAMAGE $ | | EACH OCCURRENCE $ | 1,000,000.00 | OTHER |
| ☐ BODILY INJURY $ | | DAMAGE TO RENTED PREMISES (each occurrence) $ | 50,000.00 | |
| ☐ $ 1,000.00 ☑ PER CLAIM PER OCCURRENCE | | MEDICAL EXPENSE (Any one person) $ | 5,000.00 | TOTAL |
| | | EMPLOYEE BENEFITS $ | | |
| | | Sexual, Physical abuse  1,000,000 occ $ 3,000,000 agg | | |

**OTHER COVERAGES, RESTRICTIONS AND/OR ENDORSEMENTS** (For hired/non-owned auto coverages attach the applicable state Business Auto Section, ACORD 137)

GL & PL limits are applied separately
CM form applies to PL - 07/25/05

**APPLICABLE ONLY IN WISCONSIN:  IF NON-OWNED ONLY AUTO COVERAGE IS TO BE PROVIDED UNDER THE POLICY:**

1. UM / UIM COVERAGE ☐ IS ☐ IS NOT AVAILABLE.    2. MEDICAL PAYMENTS COVERAGE ☐ IS ☐ IS NOT AVAILABLE.

## SCHEDULE OF HAZARDS

| LOC # | HAZ # | CLASSIFICATION | CLASS CODE | PREMIUM BASIS | EXPOSURE | TERR | RATE PREM/OPS | RATE PRODUCTS | PREMIUM PREM/OPS | PREMIUM PRODUCTS |
|---|---|---|---|---|---|---|---|---|---|---|
| all | | therapy treatment | 22025 | sales | 6,000,000 | 006 | | | | |
| | | full time, part time employee | | payrolls | 4,700,000 | | | | | |
| | | special events held..see app | | | | | | | | |
| | | approx 35 full time and 50 part time emps | | | | | | | | |
| | | Blanket AI, WOS , Hired & Nonowned auto liability endts | | | | | | | | |

**RATING AND PREMIUM BASIS**
(S) GROSS SALES - PER $1,000/SALES  (P) PAYROLL - PER $1,000/PAY  (A) AREA - PER 1,000/SQ FT  (C) TOTAL COST - PER $1,000/COST  (M) ADMISSIONS - PER 1,000/ADM  (U) UNIT - PER UNIT  (T) OTHER

## CLAIMS MADE (Explain all "Yes" responses)

| EXPLAIN ALL "YES" RESPONSES | Y / N |
|---|---|
| 1. PROPOSED RETROACTIVE DATE: | |
| 2. ENTRY DATE INTO UNINTERRUPTED CLAIMS MADE COVERAGE: | |
| 3. HAS ANY PRODUCT, WORK, ACCIDENT, OR LOCATION BEEN EXCLUDED, UNINSURED OR SELF-INSURED FROM ANY PREVIOUS COVERAGE? | |
| 4. WAS TAIL COVERAGE PURCHASED UNDER ANY PREVIOUS POLICY? | |

## EMPLOYEE BENEFITS LIABILITY

| | |
|---|---|
| 1. DEDUCTIBLE PER CLAIM:  $ | 3. NUMBER OF EMPLOYEES COVERED BY EMPLOYEE BENEFITS PLANS: |
| 2. NUMBER OF EMPLOYEES: | 4. RETROACTIVE DATE: |

**ACORD 126 (2011/09) QF**    Attach to ACORD 125    © 1993-2011 ACORD CORPORATION.  All rights reserved.
The ACORD name and logo are registered marks of ACORD

**AGENCY CUSTOMER ID:** n _____

## CONTRACTORS

| EXPLAIN ALL "YES" RESPONSES (For all past or present operations) | Y / N |
|---|---|
| 1.  DOES APPLICANT DRAW PLANS, DESIGNS, OR SPECIFICATIONS FOR OTHERS?<br><br>n | N |
| 2.  DO ANY OPERATIONS INCLUDE BLASTING OR UTILIZE OR STORE EXPLOSIVE MATERIAL?<br><br>n | N |
| 3.  DO ANY OPERATIONS INCLUDE EXCAVATION, TUNNELING, UNDERGROUND WORK OR EARTH MOVING? | N |
| 4.  DO YOUR SUBCONTRACTORS CARRY COVERAGES OR LIMITS LESS THAN YOURS? | N |
| 5.  ARE SUBCONTRACTORS ALLOWED TO WORK WITHOUT PROVIDING YOU WITH A CERTIFICATE OF INSURANCE? | N |
| 6.  DOES APPLICANT LEASE EQUIPMENT TO OTHERS WITH OR WITHOUT OPERATORS? | N |

| DESCRIBE THE TYPE OF WORK SUBCONTRACTED | $ PAID TO SUB-CONTRACTORS: | % OF WORK SUBCONTRACTED: | # FULL-TIME STAFF: | # PART-TIME STAFF: |
|---|---|---|---|---|
| | | | | |

## PRODUCTS / COMPLETED OPERATIONS

| PRODUCTS | ANNUAL GROSS SALES | # OF UNITS | TIME IN MARKET | EXPECTED LIFE | INTENDED USE | PRINCIPAL COMPONENTS |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

| EXPLAIN ALL "YES" RESPONSES (For all past or present products or operations)   PLEASE ATTACH LITERATURE, BROCHURES, LABELS, WARNINGS, ETC. | Y / N |
|---|---|
| 1.  DOES APPLICANT INSTALL, SERVICE OR DEMONSTRATE PRODUCTS? | N |
| 2.  FOREIGN PRODUCTS SOLD, DISTRIBUTED, USED AS COMPONENTS?  (If "YES", attach ACORD 815) | N |
| 3.  RESEARCH AND DEVELOPMENT CONDUCTED OR NEW PRODUCTS PLANNED? | N |
| 4.  GUARANTEES, WARRANTIES, HOLD HARMLESS AGREEMENTS? | N |
| 5.  PRODUCTS RELATED TO AIRCRAFT/SPACE INDUSTRY? | N |
| 6.  PRODUCTS RECALLED, DISCONTINUED, CHANGED? | N |
| 7.  PRODUCTS OF OTHERS SOLD OR RE-PACKAGED UNDER APPLICANT LABEL? | N |
| 8.  PRODUCTS UNDER LABEL OF OTHERS? | N |
| 9.  VENDORS COVERAGE REQUIRED? | N |
| 10. DOES ANY NAMED INSURED SELL TO OTHER NAMED INSUREDS? | N |

**ACORD 126 (2011/09) QF**                 Page 2 of 4

**AGENCY CUSTOMER ID:** footprints

| ADDITIONAL INTEREST / CERTIFICATE RECIPIENT | ☐ ACORD 45 attached for additional names |
|---|---|

| INTEREST | NAME AND ADDRESS | RANK: | EVIDENCE: ☐ | CERTIFICATE | INTEREST IN ITEM NUMBER | |
|---|---|---|---|---|---|---|
| ☐ ADDITIONAL INSURED | | | | | LOCATION: | BUILDING: |
| ☐ EMPLOYEE AS LESSOR | | | | | ITEM CLASS: | ITEM: |
| ☐ LIENHOLDER | | | | | ITEM DESCRIPTION | |
| ☐ LOSS PAYEE | | | | | | |
| ☐ MORTGAGEE | | | | | | |
| | REFERENCE / LOAN #: | | | | | |

## GENERAL INFORMATION

| EXPLAIN ALL "YES" RESPONSES (For all past or present operations) | Y / N |
|---|---|
| 1.   ANY MEDICAL FACILITIES PROVIDED OR MEDICAL PROFESSIONALS EMPLOYED OR CONTRACTED?<br><br>there is a PhysD | Y |
| 2.   ANY EXPOSURE TO RADIOACTIVE/NUCLEAR MATERIALS? | N |
| 3.   DO/HAVE PAST, PRESENT OR DISCONTINUED OPERATIONS INVOLVE(D) STORING, TREATING, DISCHARGING, APPLYING, DISPOSING, OR TRANSPORTING OF HAZARDOUS MATERIAL? (e.g. landfills, wastes, fuel tanks, etc) | N |
| 4.   ANY OPERATIONS SOLD, ACQUIRED, OR DISCONTINUED IN LAST FIVE (5) YEARS? | N |

| 5.   DO YOU RENT OR LOAN EQUIPMENT TO OTHERS? | | | N |
|---|---|---|---|
| EQUIPMENT | TYPE OF EQUIPMENT | INSTRUCTION GIVEN (Y/N) | |
| | ☐ SMALL TOOLS   ☐ LARGE EQUIPMENT | | |
| | ☐ SMALL TOOLS   ☐ LARGE EQUIPMENT | | |

| 6.   ANY WATERCRAFT, DOCKS, FLOATS OWNED, HIRED OR LEASED? | N |
|---|---|
| 7.   ANY PARKING FACILITIES OWNED/RENTED? | N |
| 8.   IS A FEE CHARGED FOR PARKING? | N |
| 9.   RECREATION FACILITIES PROVIDED? | N |

| 10. ARE THERE ANY LODGING OPERATIONS INCLUDING APARTMENTS?  (If "YES", answer the following): | | | N |
|---|---|---|---|
| # APTS | TOTAL APT AREA<br>Sq. Ft. | DESCRIBE OTHER LODGING OPERATIONS | |

| 11. IS THERE A SWIMMING POOL ON PREMISES?  (Check all that apply) |
|---|
| ☐ APPROVED FENCE   ☐ LIMITED ACCESS   ☐ DIVING BOARD   ☐ SLIDE   ☐ ABOVE GROUND   ☐ IN GROUND   ☐ LIFE GUARD |

| 12. ARE SOCIAL EVENTS SPONSORED? | N |
|---|---|

| 13. ARE ATHLETIC TEAMS SPONSORED? | | | | | | | N |
|---|---|---|---|---|---|---|---|
| TYPE OF SPORT | CONTACT SPORT (Y/N) | AGE GROUP | 13 - 18 | TYPE OF SPORT | CONTACT SPORT (Y/N) | AGE GROUP | 13 - 18 |
| | | ☐ 12 & UNDER | ☐ OVER 18 | | | ☐ 12 & UNDER | ☐ OVER 18 |
| EXTENT OF SPONSORSHIP: | | | | EXTENT OF SPONSORSHIP: | | | |

| 14. ANY STRUCTURAL ALTERATIONS CONTEMPLATED? | N |
|---|---|
| 15. ANY DEMOLITION EXPOSURE CONTEMPLATED? | N |

**GENERAL INFORMATION (continued)**

AGENCY CUSTOMER ID: footprints

| EXPLAIN ALL "YES" RESPONSES (For all past or present operations) | | | | Y / N |
|---|---|---|---|---|
| 16. HAS APPLICANT BEEN ACTIVE IN OR IS CURRENTLY ACTIVE IN JOINT VENTURES? | | | | N |

17. DO YOU LEASE EMPLOYEES TO OR FROM OTHER EMPLOYERS?

N

| LEASE TO | WORKERS COMPENSATION COVERAGE CARRIED (Y/N) | LEASE FROM | WORKERS COMPENSATION COVERAGE CARRIED (Y/N) |
|---|---|---|---|
| | | | |

| | Y / N |
|---|---|
| 18. IS THERE A LABOR INTERCHANGE WITH ANY OTHER BUSINESS OR SUBSIDIARIES? | N |
| 19. ARE DAY CARE FACILITIES OPERATED OR CONTROLLED? | N |
| 20. HAVE ANY CRIMES OCCURRED OR BEEN ATTEMPTED ON YOUR PREMISES WITHIN THE LAST THREE (3) YEARS? | N |
| 21. IS THERE A FORMAL, WRITTEN SAFETY AND SECURITY POLICY IN EFFECT? | Y |
| 22. DOES THE BUSINESSES' PROMOTIONAL LITERATURE MAKE ANY REPRESENTATIONS ABOUT THE SAFETY OR SECURITY OF THE PREMISES? | N |

**REMARKS (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR ANOTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THE PERSON TO CRIMINAL AND [NY: SUBSTANTIAL] CIVIL PENALTIES. (Not applicable in CO, DC, FL, HI, KS, MA, MN, NE, OH, OK, OR, VT or WA; in LA, ME, TN and VA, insurance benefits may also be denied)

IN THE DISTRICT OF COLUMBIA, WARNING:  IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON.  PENALTIES INCLUDE IMPRISONMENT AND/OR FINES.  IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS, IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT.

IN FLORIDA, ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION IS GUILTY OF A FELONY OF THE THIRD DEGREE.

IN KANSAS, ANY PERSON WHO, KNOWINGLY AND WITH INTENT TO DEFRAUD, PRESENTS, CAUSES TO BE PRESENTED OR PREPARES WITH KNOWLEDGE OR BELIEF THAT IT WILL BE PRESENTED TO OR BY AN INSURER, PURPORTED INSURER, BROKER OR ANY AGENT THEREOF, ANY WRITTEN STATEMENT AS PART OF, OR IN SUPPORT OF, AN APPLICATION FOR THE ISSUANCE OF, OR THE RATING OF AN INSURANCE POLICY FOR PERSONAL OR COMMERCIAL INSURANCE, OR A CLAIM FOR PAYMENT OR OTHER BENEFIT PURSUANT TO AN INSURANCE POLICY FOR COMMERCIAL OR PERSONAL INSURANCE WHICH SUCH PERSON KNOWS TO CONTAIN MATERIALLY FALSE INFORMATION CONCERNING ANY FACT MATERIAL THERETO; OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT.

IN MASSACHUSETTS, NEBRASKA, OREGON AND VERMONT, ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR ANOTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO, MAY BE COMMITTING A FRAUDULENT INSURANCE ACT, WHICH MAY BE A CRIME AND MAY SUBJECT THE PERSON TO CRIMINAL AND CIVIL PENALTIES.

IN WASHINGTON, IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY.  PENALTIES INCLUDE IMPRISONMENT, FINES, AND DENIAL OF INSURANCE BENEFITS.

**MARKEL**®

- [ ] **Deerfield Insurance Company**
- [ ] **Evanston Insurance Company**
- [ ] **Essex Insurance Company**
- [ ] **Markel American Insurance Company**
- [ ] **Markel Insurance Company**
- [ ] **Associated International Insurance Company**

## APPLICATION FOR SPECIFIED MEDICAL PROFESSIONS FOR PROFESSIONAL LIABILITY INSURANCE
(Claims Made Basis)

### APPLICANT'S INSTRUCTIONS:

1. Answer all questions. If the answer requires detail, please attach a separate sheet.
2. Application must be signed and dated by owner, partner or officer.
3. Please do not complete application earlier than 45 days before proposed effective date of coverage.
4. PLEASE READ CAREFULLY THE STATEMENTS AT THE END OF THIS APPLICATION.
(PLEASE TYPE OR PRINT IN INK)

---

## 1.   APPLICANT INFORMATION

a.   Full name of Applicant (include professional degree if applicant is an individual): _____
Footprints Behavioral Interventions, Inc

b.   Principal business premise address:   1901 Carnegie Ave, Ste 1-C        Orange
                    (Street)                                    (County)
Santa Ana,  CA 92705
      (City)                        (State)                              (Zip)

Please attach a list of additional office addresses.

c.   Number of Employees:  Full time 30    Part time 113    Seasonal ____    Total 143

d.   Business Phone: (714 )848.8319 _____    Home Phone: (___ )

e.   Date of Birth: _____    Place of Birth: _____

Are you a U.S. citizen? [ ] Yes [ ] No.  If No, your status, date of entry into USA: _____

f.   Square feet of total office space (all locations):  4444

g.   Your practice:

[ ] Solo practitioner (unincorporated)   [X] Professional corporation (for profit)
[ ] Solo practitioner (incorporated)   [ ] Professional corporation (non-profit)
[ ] Partnership   [ ] Employee of _____
[ ] Professional Association                              (Give name of employer)
[ ] Other (please describe) _____

h.   Formal business, corporate or partnership name:

i.   Please list the names of all partners or members of your professional association/corporation who provide professional services: _____
_____

j.   Please attach a copy of your letterhead.

k.   Is the Applicant a "Covered Entity" under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) Privacy Rule? ................................................................................................ [X] Yes [ ] No

If yes,

(i)   Has the Applicant implemented procedures to comply with the HIPAA Privacy Rule? .................. [X] Yes [ ] No
(ii)   Provide the name and title of the Applicant's Privacy Officer. PAUL LUU - PRIVACY OFFICER
Our Business Associate Agreement is available at https://www.markelcorp.com/en/US-Insurance/HIPAA. This is the only Business Associate Agreement we will recognize.

---

**MASM 5018 (02/10)**                                                                 **Page 1 of 6**

**2. EDUCATION/EXPERIENCE (Individual Applicant Only)**

Institution
Name and Address | Years of Training | Degree or Certification Attained

_____ From _____ To _____ _____
_____ From _____ To _____ _____
_____ From _____ To _____ _____

(i) Where have you practiced your profession during the last ten years?

In _____ From _____ To_____
In _____ From _____ To_____
In _____ From _____ To_____

(ii) Have you ever failed any professional licensing or specialty organization examination? ..................... [ ] Yes [ ] No
If yes, please attach a detailed explanation including the dates and location.

**3. APPLICANT PRACTICE**

a. Please list all the states where you are licensed to practice. If NONE, please attach an explanation. OREGON
HAWAII, CALIFORNIA, ARIZONA, WASHINGTON

b. Please indicate your professional specialty (CHECK ONE):

[ ] Chiropractor                 [ ] Naprapath                    [ ] Pharmacist
[ ] Counselor ( Describe)        [ ] Nurse, Licensed Practical    [ ] Physical Therapist
_____          [ ] Nurse, Registered           [ ] Psychologist
[ ] Dental Hygienist             [ ] Nurses Registry              [ ] Social Worker
[ ] Hearing Aid Fitter           [ ] Occupational Therapist       [ ] Speech Therapist
[ ] Home Health Care Agcy.       [ ] Optician                     [ ] Veterinarian
[ ] Inhalation Therapist         [ ] Optometrist                  [ ] Visiting Nurse Assoc.
[ ] Laboratory Technician        [ ] Orthotist                    [ ] X-ray Technician
[ ] Medical Personnel Pool       [ ] Perfusionist                 [X] Other (Specify) MENTAL HEALTH

c. Please indicate the sources and amounts of actual and projected revenue:

| Source | Amount This Fiscal Year | Amount Next Fiscal Year |
| --- | --- | --- |
| (i) Charitable Contributions: | $_____ | $_____ |
| (ii) Government Funding: | $_____ | $_____ |
| (iii) Fee for Services: | $_____ | $_____ |
| (iv) Other:_____ | $_____ | $_____ |
| **TOTAL GROSS REVENUE** | **$_____** | **$_____** |

d. Please provide the number of patient or client visits:

| Type of Visit | Number of Visits Last 12 Months | Number of Visits Next 12 Months |
| --- | --- | --- |
| Clinic | _____ | _____ |
| Laboratory | _____ | _____ |
| Other (specify)_____ | _____ | _____ |
| **TOTAL NUMBER OF VISITS** | _____ | _____ |

e. Please specify any professional societies or associations in which you are a member: _____
_____

f. Are you associated with or do you work for a physician or surgeon? ...................................................... [ ] Yes [X] No
If yes, please give the name and the specialty of the physician: _____

g.  Please give the approximate percentage of time spent in the following work locations:   N/A

_____% Administrative Office          _____% Laboratory            _____% Hospital Ward (specify)

_____% Classroom                      _____% Operating Room        _____

_____% Emergency Dept of Hospital     _____% Outpatient Clinic     _____% Professional Office (specify profession)

_____% Nursing Home                   _____% Patient's Home        _____

_____% Other (specify) _____

h.  Please indicate the approximate division of your patients or clients among:   N/A

_____% Hemodialysis           _____% Psychiatric        _____% Bariatrics

_____% Holistic Medicine      _____%  Drug Addicts      _____% Physical Rehabilitation

_____% Surgical               _____% Alcoholics         _____% Disability Evaluation

_____% Stress Testing         _____% Obstetrical        _____% Research or Experimental

_____% Communicable           _____% Dental             _____% _____

_____% Family Planning        _____% Pediatric          _____% _____

i.  Please indicate the number and type of your employees and/or volunteers.  IF NONE, STATE NONE.

| Type of Profession | No. | Type of Profession | No. |
|---|---|---|---|
| Inhalation Therapists | _____ | Opticians | _____ |
| Laboratory Technicians | _____ | Optometrists | _____ |
| Nurse Anesthetists | _____ | Perfusionists | _____ |
| Nurses, Licensed Practical | _____ | Pharmacists | _____ |
| Nurse Practitioner | _____ | Physiotherapists | _____ |
| Nurses, Registered | _____ | Social Workers | _____ |
| Speech Therapists | _____ | Other (please specify) | _____ |

j.  Are all of the above individuals licensed in accordance with applicable state and federal regulations?. [  ] Yes  [  ] No
If no, please attach an explanation.

---

**4.   APPLICANT PROCEDURES**

a.  Do you render professional services directly to patients?  [  ] Yes  [X] No.  If yes, please describe in detail and indicate the extent of supervision by others.

| **Description of Professional Services** | **Percent of Time Supervised** | **Qualifications of Supervisor** |
|---|---|---|
| _____ | _____ % | _____ |
| _____ | _____ % | _____ |
| _____ | _____ % | _____ |

b.  Do you render professional services that do not involve contact with a patient? [  ] Yes  [X] No.  If yes, please describe these services in detail. _____

_____

c.  (i)    Do you perform or assist in any surgical procedures?  [  ] Yes  [X] No

(ii)   Please list ALL surgical procedures performed (including minor surgery): _____

_____

_____

(iii)  Is anesthesia (other than topical or by means of local infiltration) administered by either yourself or others?
[  ] Yes  [X] No.  If yes, please attach a detailed explanation.

(iv)  Do you perform or assist in any surgical procedure(s) in a professional office or similar non-hospital facility?
[  ] Yes  [X] No.  If yes, please attach a detailed explanation.

d.  Do you perform radiation therapy?.................................................................................[  ] Yes  [X] No

e.  Do you perform psychiatric shock therapy? ..................................................................[  ] Yes  [x] No

f.  Do you compound in bulk, manufacture or wholesale medicine?.................................[  ] Yes  [X] No
If yes, please provide a detailed explanation. _____

g.  (i)   Do you perform veterinary services? .......................................................................[ ] Yes [X] No

If yes, please indicate the approximate division of your work among the following categories.

_____ % Greyhounds                    _____ % Thoroughbreds

_____ % Animals valued over $5,000.

Please attach an explanation including the frequency and the type(s) of animals treated.

h.  Do you administer artificial insemination?..................................................................[ ] Yes [X] No

If yes, please answer the following questions:

(i)   What type(s) of animals are involved? _____

(ii)  Are you responsible for the storage of the semen? ......................................[ ] Yes [ ] No

If yes, please explain. _____

_____

(iii) What percent of your practice is involved with artificial insemination? _____ %

i.  Are you ever responsible for identifying contagious diseases in your locality and/or for recommending remedial action?............................................................................[ ] Yes [X] No

If yes, please attach a detailed explanation.

---

## 5.   PERSONNEL

a.  Please list the number and type of independent contractors who provide professional services on your behalf. IF NONE, STATE NONE.   NONE

| No. | Type of Profession | No. | Type of Profession | No. | Type of Profession |
|---|---|---|---|---|---|
| _____ | Inhalation Therapists | _____ | Laboratory Technicians | _____ | Nurse Anesthetists |
| _____ | Nurses, Licensed Practical | _____ | Nurse Practitioner | _____ | Nurse, Registered |
| _____ | Opticians | _____ | Optometrists | _____ | Perfusionists |
| _____ | Pharmacists | _____ | Physiotherapists | _____ | Social Workers |
| _____ | Speech Therapists | _____ | Other (specify)_____ | | |

b.  Do you supervise any individuals who are not your own employees? [ ] Yes [X] No. If yes, please provide a detailed explanation of responsibilities and relationships to the entity which employs these individuals.

c.  Please indicate by profession the number of individuals you supervise.

| No. | Type of Profession | No. | Type of Profession |
|---|---|---|---|
| ____ | Physicians | ____ | Laboratory technicians |
| ____ | X-ray technicians | ____ | Other (please specify):_____ |

---

## 6.   APPLICANT AFFILIATIONS

a.  Do you own or operate any business other than that shown in Question 1(a) above? ..........................[ ] Yes [X] No

If yes, please give details on a separate sheet.

b.  Are you employed by any individual or entity other than that shown in Question 1(a) above?...............[ ] Yes [X] No

If yes, please attach an explanation describing details of your responsibilities.

c.  Are you under contract to any individual or entity other than that shown in Question 1(a) above? .......[ ] Yes [X] No

If yes, please attach an explanation describing details of your responsibilities. If your contract contains a hold-harmless agreement, a copy of the contract must be attached.

d.  Are you employed by or under contract to any government entity?........................................................[ ] Yes [X] No

If yes, please attach an explanation including the details of your responsibilities.

e.  Do you advertise your professional services in any manner (other than a simple listing in a telephone directory)? ................................................................................................................[X] Yes [ ] No

If yes, please attach a copy of ALL of your advertisements.

f.  Are you associated with any agency or organization that engages in any kind of advertising for, or solicitation of, patients? ................................................................................................[ ] Yes [X] No

If yes, please attach a detailed explanation and a copy of ALL of your advertisements.

g. Do you own (wholly or in part), operate, or administer any hospital, nursing home or other institutions where medical services are customarily rendered? ............................................................ [ ] Yes [X] No
If yes, please give details including the name, location, size and number of beds.

_____

_____

h. If you have a training school, please complete the following. Attach a separate sheet if needed.

| Specify Profession For Which Students Are Being Trained | Max. No. Of Students Per Session | No. of Sessions Per Year | % of Time Involved in Clinical Setting | Number of Faculty | Qualifications of Faculty (e.g. MD, RN, PhD, etc.) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

i. (i) Do you use a collection agency? ...................................................................................... [ ] Yes [X] No
If yes, please state the name of the agency

(ii) Does the agency have the authority to file a collection suit at its discretion? ................................. [ ] Yes [X] No

## 7. APPLICANT HISTORY/CLAIMS

(Attach a detailed explanation for any YES answers)

a. Have you or any of your employees:

(i) Ever been the subject of disciplinary or investigative proceedings or reprimand by a governmental or administrative agency, hospital or professional association? .............................. [ ] Yes [X] No

(ii) Ever been convicted for an act committed in violation of any law or ordinance other than traffic offenses? .......................................................................................................... [ ] Yes [X] No

(iii) Ever been treated for alcoholism or drug addiction? ..................................................... [ ] Yes [X] No

(iv) Ever had any state professional license or license to prescribe or dispense narcotics refused, suspended, revoked, renewal refuses or accepted only on special terms or ever voluntarily surrendered same? ........................................................................................................ [ ] Yes [X] No

(v) Ever had any insurance company or Lloyd's cancel, decline, refuse to renew or accept only on special terms their malpractice insurance? ................................................................ [ ] Yes [X] No

b. Please list prior professional liability insurance carried for each of the past four years. IF NONE, STATE NONE.

| Policy Insurance Carrier | Policy Number | Limits of Liability | Deductible (If any) | Premium | Inception Mo./Day/Yr. | Expiration Mo./Day/Yr. | Was this a Claims Made Policy Form? Yes | No | Retro Date |
|---|---|---|---|---|---|---|---|---|---|
| EVANSTON | SM914928 | 1/3/1/1 | | 4,988 | 7/25/17 | 7/25/18 | [X] | [ ] | 7/25/05 |
| SAME | | | | 4,329 | SAME | | [X] | [ ] | SAME |
| SAME | | | | 3,903 | SAME | | [X] | [ ] | SAME |
| SAME | | | | 4,040 | SAME | | [ ] | [ ] | _____ |

c. Does the Applicant currently participate in or plan to participate in a state patient compensation fund, health care stabilization fund or other governmentally established malpractice liability funding mechanism? ......................................................................................................... [ ] Yes [X] No

d. Has any claim or suit been brought against you and/or any of your employees? .................................. [ ] Yes [X] No
If yes, a Supplemental Claim Information Form must be completed for each claim or suit.

e. Are you aware of any circumstances which may result in a malpractice claim or suit being made or brought against you or any of your employees? .................................................................. [ ] Yes [X] No
If yes, please give details on a separate sheet.

* NOTICE TO APPLICANT: The coverage applied for is SOLELY AS STATED IN THE POLICY, which provides coverage on a "CLAIMS MADE" basis for ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD unless the extended reporting period option is exercised in accordance with the terms of the policy.

WARRANTY: I/We warrant to the Insurer, that I understand and accept the notice stated above and that the information contained herein is true and that it shall be the basis of the policy of insurance and deemed incorporated therein, should the Insurer evidence its acceptance of this application by issuance of a policy.  **I/We authorize the release of claim information from any prior insurer to the underwriting manager, Company and/or affiliates thereof.**


Kristine Carillo                                                        Director of HR & Admin
_____          _____
Name of Applicant                                              Title (Officer, partner, etc.)


_____          _____
Signature of Applicant                                         Date

SIGNING this application does not bind the Applicant or the Insurer or the Underwriting Manager to complete the insurance, but one copy of this application will be attached to the policy, if issued.



# Loss run report

**McGowan, Donnelly & Oberheu LLC - 211894 (Austin, TX)**

Footprints Behavioral Interventions Inc
Report date: 4/9/2019

| Policy | Effective date | Expiration date | Claim count | | Indemnity | LAE | Total |
|--------|---------------|-----------------|-------------|-----------|-----------|-----|-------|
| SM908438 | 7/25/2015 | 7/25/2016 | 0 | Paid: | $0 | $0 | $0 |
| | | | | Reserved: | $0 | $0 | $0 |
| | | | | Incurred: | $0 | $0 | $0 |
| SM901807 | 7/25/2014 | 7/25/2015 | 0 | Paid: | $0 | $0 | $0 |
| | | | | Reserved: | $0 | $0 | $0 |
| | | | | Incurred: | $0 | $0 | $0 |
| SM895043 | 7/25/2013 | 7/25/2014 | 0 | Paid: | $0 | $0 | $0 |
| | | | | Reserved: | $0 | $0 | $0 |
| | | | | Incurred: | $0 | $0 | $0 |
| **Policy count = 3** | | | **0** | | **$0** | **$0** | **$0** |

© Copyright 2019 Markel Corporation

Case 8:20-cv-00682-JVS-KES Document 12-4 Filed 05/04/20 Page 75 of 82 Page ID
Case 8:20-cv-00682-JVS-KES Document 1-1 Filed 04/08/20 Page 72 of 75 Page ID #:72
#:244



## Loss run report

**McGowan, Donnelly & Oberheu LLC - 211894 (Austin, TX)**

Footprints Behavioral Interventions Inc.;
Report date: 4/9/2019

| Policy | Effective date | Expiration date | Claim count | | Indemnity | LAE | Total |
|--------|---------------|-----------------|-------------|-----------|-----------|-----|-------|
| SM914928-0 | 7/25/2016 | 7/25/2017 | 0 | Paid: | $0 | $0 | $0 |
| | | | | Reserved: | $0 | $0 | $0 |
| | | | | Incurred: | $0 | $0 | $0 |
| SM920284-0 | 7/25/2017 | 7/25/2018 | 0 | Paid: | $0 | $0 | $0 |
| | | | | Reserved: | $0 | $0 | $0 |
| | | | | Incurred: | $0 | $0 | $0 |
| SM926305-0 | 7/25/2018 | 7/25/2019 | 0 | Paid: | $0 | $0 | $0 |
| | | | | Reserved: | $0 | $0 | $0 |
| | | | | Incurred: | $0 | $0 | $0 |
| UM800932-0 | 7/25/2018 | 7/25/2019 | 0 | Paid: | $0 | $0 | $0 |
| | | | | Reserved: | $0 | $0 | $0 |
| | | | | Incurred: | $0 | $0 | $0 |
| UM800932-1 | 6/13/2018 | 7/25/2019 | 0 | Paid: | $0 | $0 | $0 |
| | | | | Reserved: | $0 | $0 | $0 |
| | | | | Incurred: | $0 | $0 | $0 |
| **Policy count = 5** | | | **0** | | **$0** | **$0** | **$0** |

© Copyright 2019 Markel Corporation

Case 8:20-cv-00682-JVS-KES   Document 12-4   Filed 05/04/20   Page 76 of 82   Page ID
Case 8:20-cv-00682   Document 1   Filed 04/08/20   Page 73 of 79   Page ID #:79
#:245

# Exhibit B

Verified Correct Copy of Original 11/15/2019

1
2
3
4
5
6
7

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

**19CV49220**

| | |
|---|---|
| J.B., as Guardian ad Litem for K.B., a minor child, | ) No. ) ) |
| Plaintiffs, | ) ) ) COMPLAINT FOR NEGLIGENCE, |
| vs. | ) BATTERY, PUBLIC ) ACCOMODATIONS ) DISCRIMINATION, RESPONDEAT |
| FOOTPRINTS BEHAVIORAL INTERVENTIONS, INC., a foreign corporation; and ABIGAIL KIM, an individual, | ) SUPERIOR AND VULNERABLE ) PERSON ABUSE ) ) Not Subject to Mandatory ) Arbitration ) |
| | ) PRAYER: $800,000 ) ORS 21.160(1)(c)    $594 |
| Defendants | ) JURY TRIAL DEMANDED |

Plaintiff demands a jury trial and alleges:

1.

J.B. is the duly appointed guardian ad litem of K.B., a minor child.

2.

At all times mentioned herein, K.B. was a minor, under the age of 14, and resided in Multnomah County.

PAGE 1 – COMPLAINT FOR NEGLIGENCE, BATTERY, PUBLIC
ACCOMMODATIONS DISCRIMINATION, RESPONDEAT
SUPERIOR AND VULNERABLE PERSON ABUSE

**KAFOURY & McDOUGAL**
411 SW Second Ave., Ste. 200
Portland, OR 97204
Fax: 503-224-2673
Phone: 503-224-2647

3.

At all times mentioned herein, Abigail Kim was a practicing therapist and employee of Footprints Behavioral Interventions, Inc. (hereafter "Footprints") acting within the course and scope of her employment. Abigail Kim is a resident of Oregon.

4.

From April 21, 2017 until November 3, 2017, defendant Kim treated plaintiff K.B. as a behavior therapist at his school and home. K.B. has Autism Spectrum Disorder and Attention Deficit Hyperactivity Disorder.

FIRST CLAIM FOR RELIEF (Battery) against all defendants, plaintiff alleges:

5.

Pursuant to Abigail Kim's job performance as an employee behavioral therapist for Footprints, and with an intent to benefit the interests of defendant Footprints, defendants exercised control over K.B. and obtained his trust and confidence. As part of the approved therapy, defendant Footprints and its employees guided and monitored K.B.'s activities, whereabouts, and conduct, and administered, rewarded and punished K.B. for his behavior. The therapy provided to K.B. by Abigail Kim included counseling concerning sexual conduct including counseling K.B. regarding appropriate and inappropriate sexual behavior and contact with his genitalia. The sexual abuse described below was engendered by, and was an outgrowth of, the performance of defendant Footprints employees' job duties.

6.

The plaintiffs entrusted defendant Footprints, and its employees, to provide guidance, assistance and mental health services to him and was highly

PAGE 2 – COMPLAINT FOR NEGLIGENCE, BATTERY, PUBLIC
ACCOMMODATIONS DISCRIMINATION, RESPONDEAT
SUPERIOR AND VULNERABLE PERSON ABUSE

KAFOURY & McDOUGAL
411 SW Second Ave., Ste. 200
Portland, OR 97204
Fax: 503-224-2673
Phone: 503-224-2647

Verified Correct Copy of Original 11/15/2019

Verified Correct Copy of Original 11/15/2019

dependent upon defendant Footprints and its employees to assist him with his educational growth, and social and emotional behaviors.  K.B. was highly susceptible to defendant Footprints and its employees' control because of his psychological disorders.

7.

On approximately twenty different occasions during the time that Abigail Kim was providing therapy to K.B., Abigail Kim engaged in sexual conduct with K.B., deliberately and without lawful consent or justification, and in violation of ORS 163.415.

8.

K.B. trusted Abigail Kim and she exploited the opportunity that arose from her training, status, and employment in order to engage in sexual conduct.  The conduct occurred during time periods when Kim was providing therapy services for defendant Footprints.

9.

As a result of the above-described conduct, plaintiff suffered and will continue to suffer emotional distress including a sense of personal violation and exploitation, anxiety, humiliation, loss of trust of others, all to his non-economic damages in the amount of $800,000.

FOR A SECOND CLAIM FOR RELIEF, Negligence, against defendant Footprints:

10.

The plaintiff realleges paragraphs 1-5, and 7-9, above.

//

//

PAGE 3 – COMPLAINT FOR NEGLIGENCE, BATTERY, PUBLIC
ACCOMMODATIONS DISCRIMINATION, RESPONDEAT
SUPERIOR AND VULNERABLE PERSON ABUSE

**KAFOURY & McDOUGAL**
411 SW Second Ave., Ste. 200
Portland, OR 97204
Fax: 503-224-2673
Phone: 503-224-2647

Case 8:20-cv-00682-JVS-KES   Document 12-4   Filed 05/04/20   Page 80 of 82   Page ID
#:249
Case 8:20-cv-00682-JVS-KES   Document 1   Filed 04/08/20   Page 77 of 79   Page ID #:77

Verified Correct Copy of Original 11/15/2019

11.

Defendant Footprints was negligent in one or more of the following particulars:

1. In assigning Abigail Kim as K.B.'s therapist when Abigail Kim had inadequate training and experiences to provide an individual with K.B.'s characteristics with therapy.

2. In failing to adequately supervise and monitor Abigail Kim's provision of therapy to K.B.

12.

The above-described course of conduct by defendant Kim was negligent in that it fell below the standard of care of ordinarily and reasonably prudent practitioners of her profession within this community.

13.

FOR A THIRD CLAIM FOR RELIEF (Public Accommodations Discrimination) against Defendant Footprints, plaintiff alleges:

14.

Plaintiff realleges and incorporates by reference paragraphs 1-9, above. Footprints provides therapist services to the public within the meaning of ORS 659A.400(1).

15.

At the time of the conduct described in paragraphs 7-8 above, K.B. was a child and the acts of defendant constituted child abuse within the meaning of ORS 12.117.

//

//

PAGE 4 – COMPLAINT FOR NEGLIGENCE, BATTERY, PUBLIC ACCOMMODATIONS DISCRIMINATION, RESPONDEAT SUPERIOR AND VULNERABLE PERSON ABUSE

KAFOURY & McDOUGAL
411 SW Second Ave., Ste. 200
Portland, OR 97204
Fax: 503-224-2673
Phone: 503-224-2647

Verified Correct Copy of Original 11/15/2019

16.

Abigail Kim sexually abused plaintiff because of his gender, male, and would not have done so had he been a woman. Such conduct occurred while Abigail Kim was providing services and violated ORS 659A.400.

17.

Plaintiff is entitled to her reasonable attorney fees and expert fees under ORS 20.107 and ORS 659A.885(6).

FOR A FOURTH CLAIM FOR RELIEF (Vulnerable Person Abuse; Respondeat Superior) against Defendant Footprints, plaintiff alleges:

18.

Plaintiff realleges paragraphs 1-9, above.

19.

At all times mentioned herein plaintiff was a vulnerable person within the meaning of ORS 124.100(1)(e), and suffered physical abuse within the meaning of ORS 124.105.

20.

Pursuant to ORS 124.200(2)(b), plaintiff is entitled to his reasonable attorney fees, guardian ad litem fees and an amount equal to three times all noneconomic damages.

//
//
//
//
//
//
//

PAGE 5 – COMPLAINT FOR NEGLIGENCE, BATTERY, PUBLIC
ACCOMMODATIONS DISCRIMINATION, RESPONDEAT
SUPERIOR AND VULNERABLE PERSON ABUSE

**KAFOURY & McDOUGAL**
411 SW Second Ave., Ste. 200
Portland, OR 97204
Fax: 503-224-2673
Phone: 503-224-2647

Verified Correct Copy of Original 11/15/2019

1   WHEREFORE, plaintiff prays for judgment against defendants for

2   $800,000 in noneconomic damages, and for his costs and disbursements

3   necessarily incurred herein.

4

5   Dated: November 13 , 2019.

6

7   Gregory Kafoury, OSB #741663
    Mark McDougal, OSB #890869

8   Jason Kafoury, OSB #091200
    jkafoury@kafourymcdougal.com

9   kafoury@kafourymcdougal.com
    mcdougal@kafourymcdougal.com

10  Attorneys for Plaintiff

11  Plaintiffs hereby provides notice of their intent to amend to include a

12  claim for punitive damages.

13

14

15

16

17

18

19

20

21

22

23

PAGE 6 – COMPLAINT FOR NEGLIGENCE, BATTERY, PUBLIC
ACCOMMODATIONS DISCRIMINATION, RESPONDEAT
SUPERIOR AND VULNERABLE PERSON ABUSE

KAFOURY & McDOUGAL
411 SW Second Ave., Ste. 200
Portland, OR 97204
Fax: 503-224-2673
Phone: 503-224-2647